JOURNAL ENTRY AND OPINION
{¶ 1} The two appeals addressed here were consolidated for purposes of judicial economy. Appellants Dr. Bhupinder Sawhny and Stryker Corporation ("Stryker") appeal the jury verdict, which awarded the appellees, Basil and Judith Zappola, $1,750,000 for medical negligence. Appellant Neurological Association Inc. appeals the jury's verdict, which found that its negligence directly and proximately caused 72.5 percent of the appellees' damages. Appellant Stryker also appeals the jury's verdict, which found that it directly and proximately caused 27.5 percent of the appellees' damages. After a thorough review of the record and for the reasons set forth below, we affirm the judgment of the trial court.
 {¶ 2} The dispute between the parties arose from a neurological surgery performed by Dr. Sawhny, wherein a product manufactured by Stryker was used. On October 25, 2002, the appellees filed a complaint against appellant Stryker and its employee, Brett Baird, alleging that Stryker was liable for defective manufacture, defective design, failure to warn, common law negligence, negligent preparation, negligent misrepresentation and fraud. During the discovery process, the appellees concluded that Dr. Sawhny, the operating surgeon, was also responsible for damages and, on December 31, 2003, they amended their complaint to add Dr. Sawhny and Neurological Association Inc., the medical professional organization under which Dr. Sawhny practices.
 {¶ 3} On July 2, 2004, appellant Stryker filed a motion for summary judgment, arguing that its duty to appellee Basil Zappola was discharged when it provided product information to Dr. Sawhny. The appellees, as well as appellant Dr. Sawhny, opposed the motion. On September 24, 2004, Dr. Sawhny sought leave to file a cross claim against Stryker for indemnification and contribution. On October 4, 2004, Stryker also sought leave to file a cross claim against Dr. Sawhny for indemnification and contribution. The trial court granted the motions of both appellants.
 {¶ 4} On November 3, 2004, a jury trial commenced. As the trial began, the trial judge informed the parties that appellant Stryker's motion for summary judgement was denied. A journal entry issued November 10, 2004 evidenced the trial court's holding.
 {¶ 5} After the appellees rested their case, appellant Stryker moved for a directed verdict. The trial court denied Stryker's motion; it was also denied a second time after it had been renewed at the close of all evidence.
 {¶ 6} On November 15, 2004, the jury returned a unanimous verdict in favor of the appellees, finding Neurological Associates and Dr. Sawhny liable for medical negligence and Stryker and its employee, Brett Baird, liable for negligence and negligent misrepresentation. The jury awarded the appellees 1.75 million dollars in damages.
 {¶ 7} Regarding the cross claims of the appellants, the jury found Dr. Sawhny and his organization, Neurological Association, 72.5 percent liable for the negligence and attributed 27.5 percent of the negligence to Stryker and its employee, Brett Baird. The trial court entered a judgment for joint and several liability on November 16, 2004. On November 30, 2004, appellants Dr. Sawhny and Neurological Associates filed a motion for a new trial, which was denied by the trial court on February 2, 2005. Following the trial court's denial of their motion for a new trial, Dr. Sawhny and Neurological Associations filed this appeal. Appellants Stryker and its employee, Brett Baird, followed by filing an appeal as well. Although the two appeals were filed separately, since they arose from the same facts and circumstances, they have been consolidated for hearing and disposition.
 {¶ 8} The incident that gave rise to the present case occurred on February 28, 2001. On that day, appellee Basil Zappola ("Basil") underwent surgery at Southwest General Hospital to remove a benign brain tumor. The surgery was performed by appellant Bhupinder Sawhny, M.D. The surgery was originally scheduled as a craniotomy, wherein a portion of Basil's skull would be removed to expose the tumor; the tumor would then be removed; and finally, the bone flap that had been removed from his skull would be replaced. Appellant Brett Baird, a medical sales representative employed by appellant Stryker, delivered a rigid fixation system to the hospital prior to Basil's surgery. The rigid fixation system was designed to reattach the bone flap that would be removed from Basil's skull during surgery once the tumor was extracted. During surgery, however, it was discovered that the tumor had spread to the skull, making the portion of the skull covering the tumor no longer salvageable. Because the bone flap could not be reattached, Baird, who was present in the hospital during the surgery, was informed that the rigid fixation system was no longer necessary. He was asked by Dr. Sawhny to observe the size of the cranial defect in Basil's skull. After viewing the defect, Dr. Sawhny and Baird discussed possible ways to close the skull. Dr. Sawhny expressed to Baird that he did not want to use mesh to close the skull because the defect was close to Basil's brow line, and he feared that the wire mesh would protrude trough the skin. Dr. Sawhny also did not want to use a product called Methylmethacrylate because he feared that the product would overheat the exposed portion of Basil's brain, causing neurological damage.
 {¶ 9} Baird suggested using a product called BoneSource. Dr. Sawhny expressed concern about using this product because, in his past experience, he found that similar products took a long time to set. Baird informed Sawhny that the product had been improved and sets much faster than it had in the past. Dr. Sawhny ultimately decided to use BoneSource and, after observing the size of the defect in Basil's skull, Baird went to his vehicle to retrieve a package of the product. The total surface area of the defect in Basil's skull was approximately 48 centimeters. After receiving the package of BoneSource, the product was mixed and applied to the skull at the site of the defect. Although the package contained instructions for use, Dr. Sawhny did not read the instructions. The instructions for use ("IFU") contained in the package of BoneSource specifically provided:
 {¶ 10} "BoneSource Hydroxyapatite Cement is indicated for use in the repair of neurosurgical burr holes, contiguous craniotomy cuts and other cranial defects with a surface area no larger than 25cm per defect."
 {¶ 11} With respect to cranial defects larger than four centimeters, the IFU provided:
 {¶ 12} "Reenforcement with metal mesh or implants should be considered for defects greater than 4cm, or covering convexity."
 {¶ 13} The IFU provided additional precautions for cranial defects larger than four centimeters:
 {¶ 14} "In defects greater than 4cm, closed suction drainage is recommended to prevent wound fluid accumulation during the immediate post operative period. Excess fluid can cause BoneSource to malfunction."
 {¶ 15} Basil's cranial defect had a total surface area of approximately 48 centimeters. Although the IFU suggested wire mesh to support the application of BoneSource, as well as closed suction drainage during the post operative period, Dr. Sawhny did not use these methods.
 {¶ 16} After the surgery was completed, Basil developed a cerebrospinal fluid ("CSF") leak at the wound site. After several attempts to stop the leak, Dr. Sawhny performed a second surgery on April 12, 2001. During the second surgery, it was discovered that the BoneSource application had completely fragmented. In an effort to repair the leak, Dr. Sawhny removed portions of the fragmented BoneSource and covered the defect with wire mesh. Although Dr. Sawhny attempted to stop the leak, it persisted, requiring a third surgery. On July 11, 2001, Dr. Sawhny performed a third surgery and observed that CSF fluid was leaking through the dura, and residual pieces of the BoneSource product were still present at the defect site. In response, Dr. Sawhny attempted to reseal the cranial defect with additional wire mesh and fibrin glue.
 {¶ 17} Although Basil had undergone three surgeries, the CSF leak continued, and a fourth surgery was performed on November 21, 2001. During the fourth surgery, a plastic surgeon was called in to remove scar tissue from the wound site. Although the scar tissue was removed, the leak persisted, requiring a fifth surgery. On March 6, 2002, Dr. Sawhny performed the fifth surgery on Basil's cranial defect. During that surgery, Dr. Sawhny removed the wire mesh from the site of the defect and applied Methylmethacrylate to seal it. The product proved successful, and the CSF leak ceased.
 {¶ 18} After enduring five invasive neurological surgeries, as well as permanent damage and deformity to the outer covering of the brain, and severe physical, emotional and economic damages, the appellees asserted a negligence claim against the appellants. The jury awarded appellees 1.75 million dollars in damages.
 {¶ 19} Appellants Stryker and Brett Baird bring their appeal asserting twelve assignments of error. Appellants Bhupinder Sawhny and Neurosurgical Associates Inc. assert three assignments of error for our review in their appeal.
 Assignments of Error of Stryker Corporation and Brett Baird: {¶ 20} "I. The trial court erred in denying defendants Stryker Corporation and Brett Baird's motion for summary judgment because Stryker Corporation and Mr. Baird discharged their duty to warn by providing the BoneSource instructions for use ("IFU") to Dr. Sawhny, a learned intermediary. (Stryker's motion for summary judgment, July 2, 2004; Entry Nov. 10, 2004.)"
 {¶ 21} Appellants Stryker and Baird argue that the trial court erred when it denied their motion for summary judgment. More specifically, they assert that their duty to appellee Basil Zappola was discharged when Baird provided Dr. Sawhny, a learned intermediary, with instructions for using the BoneSource product. They contend that, as a result of providing Dr. Sawhny with instructions, the duty of care completely shifted to him, warranting summary judgment in their favor.
 {¶ 22} Civ.R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that: (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317,327, 364 N.E.2d 267.
 {¶ 23} It is well established that the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. Celotex Corp. v. Catrett (1987),477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed. 2d 265; Mitseff v.Wheeler (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798. Doubts must be resolved in favor of the nonmoving party. Murphy v.Reynoldsburg (1992), 65 Ohio St.3d 356, 604 N.E.2d 138.
 {¶ 24} In Dresher v. Burt, 75 Ohio St.3d 280,1996-Ohio-107, 662 N.E.2d 264, the Ohio Supreme Court modified and/or clarified the summary judgment standard as applied inWing v. Anchor Media, Ltd. of Texas (1991), 59 Ohio St.3d 108,570 N.E.2d 1095. Under Dresher, "* * * the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of therecord which demonstrate the absence of a genuine issue of factor material element of the nonmoving party's claim." Id. at 296. (Emphasis in original.) The nonmoving party has a reciprocal burden of specificity and cannot rest on mere allegations or denials in the pleadings. Id. at 293. The nonmoving party must set forth "specific facts" by the means listed in Civ.R. 56(C) showing a genuine issue for trial exists. Id.
 {¶ 25} This court reviews the lower court's granting of summary judgment de novo. Brown v. Scioto Cty. Bd. of Commrs.
(1993), 87 Ohio App.3d 704, 622 N.E.2d 1153. An appellate court reviewing the grant of summary judgment must follow the standards set forth in Civ.R. 56(C). "The reviewing court evaluates the record * * * in a light most favorable to the nonmoving party * * *. [T]he motion must be overruled if reasonable minds could find for the party opposing the motion." Saunders v. McFaul (1990),71 Ohio App.3d 46, 50, 593 N.E.2d 24; Link v. Leadworks Corp.
(1992), 79 Ohio App.3d 735, 741, 607 N.E.2d 1140.
 {¶ 26} The appellants argue that by providing Dr. Sawhny with instructions regarding the use of the BoneSource product, their duty to the appellees was discharged. They assert that, pursuant to the learned intermediary doctrine, a manufacturer's duty to warn is satisfied by providing an adequate warning to a learned intermediary, such as Dr. Sawhny. Accordingly, they contend that because their duty was discharged upon providing that warning, no genuine issue of material fact remains to be litigated, making summary judgment proper. We do not agree.
 {¶ 27} During his deposition, Brett Baird testified that it is his duty as a medical sales representative to "make sure that the product is being used according to the way it's supposed to be used." Baird also testified that as part of his employment, he is responsible for "consulting on the application of the product." Baird's testimony is consistent with the law regarding a manufacturer's liability. In Vaccariello v. Smith NephewRichards, Inc. (2002), 94 Ohio St.3d 380, the Ohio Supreme Court held:
 {¶ 28} "The learned intermediary doctrine does not relieve the manufacturer of liability to the ultimate user for an inadequate or misleading warning; it only provides that the warning reaches the ultimate user through the learned intermediary."
 {¶ 29} It is clear from the Court's holding in Vaccariello
that a manufacturer's duty can only be discharged upon providing a learned intermediary with an adequate warning.
 {¶ 30} The total surface area of Basil's cranial wound was 48 centimeters. The BoneSource instructions specifically stated that wire mesh is suggested to support cranial defects larger than four centimeters. The instructions also provide that post operative drains are recommended for cranial defects larger than four centimeters. Although Baird physically witnessed the circumference of Basil's cranial defect, he did not inform Dr. Sawhny that wire mesh was necessary to support the application of BoneSource to the skull or that a drain would greatly aid in Basil's post operative recovery. Instead, Baird allowed Dr. Sawhny to rely upon the written instructions, even though he later testified that he was aware that Dr. Sawhny did not actually read them.
 {¶ 31} The appellants were responsible for informing Dr. Sawhny about the product and the proper use of the product. Although Dr. Sawhny made the ultimate decision as to whether the product was used and how it was applied, Baird still had a duty to provide Dr. Sawhny with adequate information.
 {¶ 32} The appellants argue that the learned intermediary doctrine insulates them from liability; however, it is clear from the pertinent case law, as well as from Brett Baird's own testimony regarding his responsibilities as a medical sales representative, that the appellants did not provide Dr. Sawhny with an adequate warning. Because a genuine issue of material fact regarding the appellants' liability remained to be litigated, the trial court was not in error when it denied the appellants' motion for summary judgment. Accordingly, we agree with the ruling of the trial court and find appellants' first assignment of error without merit.
 {¶ 33} Because assignments of error two and three are substantially interrelated, they will be addressed together.
 {¶ 34} "II. The trial court erred in denying defendants Stryker Corporation and Brett Baird's motion for directed verdict at the close of plaintiff's case-in-chief because Stryker Corporation and Mr. Baird discharged their duty to warn by providing the BoneSource IFU to Dr. Sawhny, a Learned Intermediary. (Entry, Nov. 10, 2004; trial TR. At 1401-25.)
 {¶ 35} "III. The trial court erred when it denied defendants Stryker and Brett Baird's motion for directed verdict at the close of all evidence because Stryker Corporation and Mr. Baird discharged their duty to warn by providing the BoneSource IFU to Dr. Sawhny a learned intermediary. (Entry, Nov. 12, 2004; trial Tr. At 1599-1600.)"
 {¶ 36} Here the appellants argue that the trial court erred when it denied their motion for directed verdict at the close of the appellees' case and denied their renewed motion at the close of all of the evidence. The appellants assert that, pursuant to the learned intermediary doctrine, their duty to warn was discharged when they provided instructions for the use of the product to Dr. Sawhny. They contend that, based upon the evidence submitted at trial, their motion for directed verdict should have been granted.
 {¶ 37} A motion for directed verdict is to be granted when, construing the evidence most strongly in favor of the party opposing the motion, the trial court finds that reasonable minds could come to only one conclusion and that conclusion is adverse to such party. Civ.R. 50(A)(4); Crawford v. Halkovics (1982),1 Ohio St.3d 184; The Limited Stores, Inc. v. Pan American WorldAirways, Inc. (1992), 65 Ohio St.3d 66.
 {¶ 38} A directed verdict is appropriate where the party opposing it has failed to adduce any evidence on the essential elements of this claim. Cooper v. Grace Baptist Church (1992),81 Ohio App.3d 728, 734. The issue to be determined involves a test of the legal sufficiency of the evidence to allow the case to proceed to the jury, and it constitutes a question of law, not one of fact. Hargrove v. Tanner (1990), 66 Ohio App.3d 693,695; Vosgerichian v. Mancini Shah Associates, et al. (Feb. 29, 1996), Cuyahoga App. Nos. 68931 and 68943. Accordingly, the courts are testing the legal sufficiency of the evidence rather than its weight or the credibility of the witnesses. Ruta v.Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 68-69.
 {¶ 39} Since a directed verdict presents a question of law, an appellate court conducts a de novo review of the lower's court judgment. Howell v. Dayton Power and Light Co. (1995),102 Ohio App.3d 6, 13; Keeton v. Telemedia Co. of S. Ohio (1994),98 Ohio App.3d 1405, 1409.
 {¶ 40} Although the appellants argue that, pursuant to the learned intermediary doctrine, the trial court erred in denying their motions for directed verdict, we cannot agree. As previously stated in the analysis of their first assignment of error, the appellants did not provide Dr. Sawhny with an adequate warning, as required under the learned intermediary doctrine. Although the written instructions suggested that wire mesh should be used to secure the BoneSource product to the skull and drainage tubes should be used as a part of the post operative recovery, Baird did not make these recommendations to the doctor. Despite the fact that he was professionally obligated to inform Dr. Sawhny about the use of the product and personally observed the size of Basil's cranial defect, Baird did not uphold his duty of ensuring that the product was used properly.
 {¶ 41} It is clear from the evidence presented at trial that the appellants did not meet the standard necessary for a directed verdict. Their actions do not lead reasonable minds to the lone result that they were discharged of their duty to the appellees. The totality of the evidence presented at trial raised serious questions regarding the appellants' negligence. In a case where a great amount of evidence is presented supporting the essential elements of a claim, a directed verdict is not appropriate. Accordingly, the trial court was not in error when it denied the appellants' motions for a directed verdict, and their second and third assignments of error are without merit.
 {¶ 42} "IV. The trial court abused its discretion when it permitted Drs. Ammerman and McCormick to testify regarding the credibility of fact witnesses. (Trial Tr. At 942-1049, 10661-180.)"
 {¶ 43} The appellants next argue that the trial court abused its discretion when it permitted Drs. Ammerman and McCormick to testify regarding their opinions of what likely occurred in the operating room between Brett Baird and Dr. Sawhny. Specifically, they assert that the testimony of Drs. Ammerman and McCormick attacked Baird's veracity as a witness, and the trial court's admission of their testimony was improper. The appellants contend that expert witnesses cannot testify to the veracity of another witness because such determinations are properly suited for the trier of fact.
 {¶ 44} To constitute an abuse of discretion, the ruling must be more than legal error; it must be unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 50 OBR 481, 450 N.E.2d 1140.
 {¶ 45} "The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations." State v. Jenkins (1984),15 Ohio St.3d 164, 222, quoting Spalding v. Spalding (1959),355 Mich. 382, 3843-85. In order to have an abuse of that choice, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias. Id.
 {¶ 46} Although the appellants argue that the trial court permitted Drs. Ammerman and McCormick to testify to Baird's veracity as a witness, we find this argument to be without merit. Pursuant to the Ohio Rules of Evidence, expert witnesses are permitted to testify regarding their training and expertise. Evid.R. 702 provides in pertinent part:
 {¶ 47} "A witness may testify as an expert if all of the following apply:
 {¶ 48} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 49} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 50} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."
 {¶ 51} As board certified neurosurgeons who have worked with product representatives in an operating room setting, Drs. Ammerman and McCormick have the training and expertise that enabled them to give their professional opinions as to what likely occurred between Baird and Dr. Sawhny. Although the appellants argue that this was an issue better suited for the jury, it is clear that the situation involved the interactions between a neurosurgeon and a medical sales representative in an operative setting, requiring a level of professional knowledge that a jury simply would not possess.
 {¶ 52} Dr. McCormick testified that, on the basis of his expertise and experience, Dr. Sawhny's recollection of what took place in the operating room was the most plausible. Similarly Dr. Ammerman testified that, based upon his knowledge and experience, he believed Baird misinformed Dr. Sawhny on the proper use of the BoneSource product. It is clear that the doctors did not attack the veracity of Baird's testimony, but instead provided their own opinion of what could have occurred based upon their professional experience.
 {¶ 53} In reaching their own opinions, Drs. Ammerman and McCormick did not take the ultimate conclusion away from the jury.
During their testimony, Drs. Ammerman and McCormick made it clear that they were testifying as to their own opinions, and the jury was fully aware that Drs. Ammerman and McCormick were expert witnesses and were not present when the operation took place. The expert testimony gave the jury the ability to evaluate all of the evidence presented and reach an informed conclusion.
 {¶ 54} It is clear that the interaction between Baird and Dr. Sawhny necessitated the testimony of expert witnesses, and the trial court did not abuse its discretion in allowing that testimony. Pursuant to the Ohio Rules of Evidence, Drs. Ammerman and McCormick were more than qualified to serve as expert witnesses and offered admissible testimony that reflected their own professional opinions. Accordingly, the trial court's actions were neither unreasonable, arbitrary nor unconscionable, and the appellants' fourth assignment of error is without merit.
 {¶ 55} "V. The trial court abused its discretion when it permitted Drs. Ammerman and McCormick to testify regarding a sales representative's standard of care because they were unqualified to do so. (Trial Tr. At 942-1049, 1066-1180.)"
 {¶ 56} The appellants argue that the trial court abused its discretion when it permitted Drs. Ammerman and McCormick to testify regarding a medical sales representative's standard of care. They assert that Drs. Ammerman and McCormick were not qualified to offer such testimony.
 {¶ 57} Although the appellants argue that, as physicians, Drs. Ammerman and McCormick were unqualified to testify regarding the standard of care required of a medical sales representative, we disagree with their assertion. As discussed above in assignments of error II and III, Evid.R. 703 provides that expert witnesses may present testimony and assert opinions based upon their professional knowledge, and experience. Drs. Ammerman and McCormick testified that, based upon their knowledge and experience as board certified neurosurgeons with experience performing craniotomies and craniectomies, it was their belief that Baird breached his duty as a medical sales representative. Drs. Ammerman and McCormick each have extensive experience working with medical sales representatives in the neurological field and are fully aware of how a sales representative is expected to interact with a physician. Both doctors are also well versed in the duties and responsibilities of a sales representative in an operative setting. Because Drs. Ammerman and McCormick have personal experience with the unique relationship between a sales representative and surgeon, they were more than qualified to testify regarding a sales representative's standard of care.
 {¶ 58} In light of Drs. Ammerman and McCormick's extensive professional experience, the trial court's actions were neither unreasonable, arbitrary nor unconscionable. Accordingly, the trial court did not abuse its discretion when it allowed them to testify regarding the standard of care required of a sales representative, and the appellants' fifth assignment of error is without merit.
 {¶ 59} "VI. The trial court abused its discretion when it precluded Ryan Emery from testifying regarding the scope of a sales representative's standard of care because, pursuant to Evid.R. 701, lay witnesses are permitted to render opinions regarding their perceptions. (Trial Tr. At 1429-88.)"
 {¶ 60} Here the appellants argue that the trial court abused its discretion when it precluded Ryan Emery, a former medical sales representative, from testifying regarding a sales representative's standard of care. More specifically, they assert that, pursuant to Evid.R. 701, the trial court erred when it prevented Emery from presenting testimony regarding his opinion of what a medical doctor would do in reaction to a recommendation made by a sales representative.
 {¶ 61} Although the appellants testified that Emery's testimony was admissible pursuant to Evid.R. 701, we do not agree. Evid.R. 701 provides in pertinent part:
 {¶ 62} "If a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."
 {¶ 63} The appellants argue that Evid.R. 701, which pertains to testimony given by lay witnesses, allows Emery to testify; however, the subject matter of his testimony clearly calls on his knowledge and experience as a former sales representative, rather than as a lay person. Emery's testimony is not based upon his own perceptions, but rather on his professional opinion of how a physician would react under a certain circumstance. The appellants did not submit the required documents to qualify Emery as an expert witness, thus, they limited his testimony to his own perceptions as a lay person. It is clear that, although they did not submit the proper documentation to the court, through their line of questioning, they were attempting to elicit expert testimony from a lay witness. In light of Emery's status as a lay witness, the trial court's actions of refusing to allow him to present expert testimony were neither unreasonable, arbitrary nor unconscionable. Accordingly, the trial court did not abuse its discretion, and the appellants' sixth assignment of error is without merit.
 {¶ 64} "VII. The trial court abused its discretion when it permitted Drs. Sawhny, Ammerman and McCormick to testify regarding causation because they were unqualified to do so. (Trial Tr. At 839-937, 942-1049, 1066-1180.)"
 {¶ 65} The appellants argue that the trial court abused its discretion when it permitted Drs. Sawhny, Ammerman and McCormick to testify regarding causation. They assert that the doctors were unqualified to offer such testimony because Drs. Ammerman and McCormick had never personally used the BoneSource product, and Dr. Sawhny had only used a product similar to BoneSource on one previous occasion. The appellants contend that because neither of the physicians had used the Bonesource product, they could not testify that BoneSource caused the CSF leak that lead to Basil's numerous surgeries.
 {¶ 66} Although they argue that Drs. Sawhny, Ammerman and McCormick could not establish a causal connection between the BoneSource product and the appellees' damages, we disagree. Drs. Sawhny, Ammerman and McCormick are all board certified neurosurgeons and have extensive experience with cranial defects. Although the doctors were not specifically familiar with the BoneSource product, as a part of their education as neurosurgeons, they are trained to identify cranial injuries and their causes. It is not necessary that a physician have experience with a particular product to know the source of an injury. Neurosurgeons are specifically trained to diagnose the cause of cranial injuries and do not need experience with a particular product to do so. If the appellants' logic were followed, physicians would only be able to diagnose and treat injuries that derive from products they are personally familiar with. This would clearly lead to an undesirable result.
 {¶ 67} When the trial court allowed Drs. Sawhny, Ammerman and McCormick to testify regarding causation, the decision to do so was neither unreasonable, arbitrary nor unconscionable. Accordingly, the trial court did not abuse its discretion, and the appellants' seventh assignment of error is without merit.
 {¶ 68} "VIII. The trial court abused its discretion when it permitted Drs. Ammerman and McCormick to testify that the BoneSource IFU was inadequate because they were unqualified to do so. (Trial Tr. At 942-1049, 1066-1180.)"
 {¶ 69} Here the appellants argue that the trial court abused its discretion when it permitted Drs. Ammerman and McCormick to testify regarding the inadequacy of the BoneSource instructions for use. They assert that Drs. Ammerman and McCormick were unqualified to offer such testimony because neither had ever drafted or assisted in drafting instructions for use for any medical product or device.
 {¶ 70} The appellants contend that Drs. Ammerman and McCormick were unqualified to offer their opinion regarding the safety of the BoneSource instructions for use; however, this court does not agree. Drs. Ammerman and McCormick testified that the instructions for use suggested mesh to secure cranial defects larger than four centimeters; however, the instructions did not require it nor mandate it. The instructions also suggested use of a drain for cranial defects four centimeters or larger in circumference; however, again, the instructions did not require or mandate the use of drains to aid in post operative recovery. Drs. Ammerman and McCormick, as board certified neurosurgeons, have received extensive training and have expertise in the area of cranial defects. Pursuant to Evid.R. 702, they were more than qualified to testify regarding the quality of the BoneSource instructions. They were aware of the size of the cranial defect and knew the materials and post operative procedures that would be necessary to properly close the defect and prevent problems, such as those endured by the appellee.
 {¶ 71} The trial court was neither unreasonable, arbitrary nor unconscionable, when it allowed Drs. Ammerman and McCormick to testify regarding the BoneSource instructions for use. Accordingly, the trial court did not abuse its discretion, and the appellants' eighth assignment of error is without merit.
 {¶ 72} "IX. The trial court abused its discretion when it refused to preclude arguments that the BoneSource IFU was inadequate and made an error of law when it refused to give defendants Stryker Corporation and Brett Baird's proposed jury instructions regarding the adequacy of the IFU because, under Ohio Law, a doctor's failure to read a warning precludes the argument that the warning was inadequate."
 {¶ 73} The appellants argue that the trial court abused its discretion when it refused to preclude arguments regarding the inadequacy of the Bonesource instructions for use and refused to give the appellant's proposed jury instructions concerning the adequacy of the instructions for use. More specifically, they assert that the trial court should have submitted their proposed jury instruction because Dr. Sawhny's failure to read the instructions for use precludes the arguments that the instructions were inadequate.
 {¶ 74} The appellants argue that the trial court abused its discretion when it refused to submit their jury instructions to the jury. We disagree. Although Dr. Sawhny admittedly did not read the instructions for use with the BoneSource product, the appellees did not assert the argument that the factual content of the instructions was inadequate, but rather argued that the manner in which the instructions were relayed to Dr. Sawhny was inadequate. The argument regarding the adequacy of the actual instructions for use resides between the appellants in their cross claim against Dr. Sawhny and Neurological Associates.
 {¶ 75} In addition, the appellants' proposed instruction was a misstatement of the law. Their jury instruction provided:
 {¶ 76} "Because Dr. Sawhny failed to read the instructions for use, you must not consider whether the language of the instructions for use was inadequate, and that he would have changed his actions if that language was different."
 {¶ 77} This proposed jury instruction is a clear misstatement of the law regarding a manufacturer's liability. The Ohio Supreme Court's holding in Vaccariello, supra, provides the standard to which a manufacturer is held pursuant to the learned intermediary doctrine:
 {¶ 78} "The learned intermediary doctrine does not relieve the manufacturer of liability to the ultimate user for an inadequate or misleading warning; it only provides that the warning reaches the ultimate user through the learned intermediary."
 {¶ 79} The law in Ohio requires a manufacturer to provide an adequate warning. Brett Baird testified in his deposition that it was his responsibility as a sales representative to provide adequate instructions to the operating physician regarding the BoneSource product. It is clear from Baird's statements, as well as from the applicable law regarding learned intermediaries, that the appellants' proposed jury instruction was a misstatement of the law. Therefore, the trial court's actions were neither unreasonable, arbitrary nor unconscionable when it permitted Drs. Ammerman and McCormick to testify regarding the adequacy of the instructions for use and when it excluded the appellants' jury instructions as a misstatement of the law. Accordingly, the trial court did not abuse its discretion, and the appellant's ninth assignment of error is without merit.
 {¶ 80} "X. The trial court abused its discretion when it refused to preclude Dr. Ammerman from testifying on the grounds that his testimony was cumulative. (Trial Tr. At 1060, 10661-181.)"
 {¶ 81} The appellants argue that the trial court abused its discretion when it refused to preclude Dr. Ammerman from testifying. Specifically, they assert that Dr. Ammerman's testimony was unnecessary because it merely echoed that of Dr. McCormick's.
 {¶ 82} Although the appellants argue that the trial court abused its discretion in allowing Dr. Ammerman to testify, we cannot agree. Pursuant to Evid.R. 402, all relevant evidence is admissible and may only be excluded by the trial court when its probative value is substantially outweighed by the danger of undue prejudice, undue delay, or needless presentation of cumulative evidence. Further, Evid.R. 403(B) provides that the trial court may exercise its discretion to exclude relevant evidence.
 {¶ 83} The trial court exercised its discretion by allowing Dr. Ammerman to testify. Although portions of his testimony may have been cumulative by virtue of the fact that it concerned the same cranial defect and medical product, Dr. Ammerman provided an additional perspective rather than simply a cumulative one. The trial court was neither unreasonable, arbitrary nor unconscionable when it permitted Dr. Ammerman to testify. Accordingly, the appellant's tenth assignment of error is without merit.
 {¶ 84} "XI. The trial court abused its discretion when it refused to give Stryker's proposed jury instructions on non-delegable duty, the learned intermediary doctrine and indemnification. (Stryker's second amended proposed jury instructions, Nov. 12, 2004; Trial tr. at 1743-46.)"
 {¶ 85} Here the appellants argue that the trial court abused its discretion when it refused to give their jury instructions regarding non-delegable duty, the learned intermediary doctrine and indemnification. They contend that they were entitled to their proposed jury instruction regarding non-delegable duty because Ohio law mandates that a surgeon have a non-delegable duty to see that an operation is performed with due care. They further contend that they were also entitled to their jury instruction regarding the learned intermediary doctrine because under Ohio law a manufacturer is removed from liability when it provides instructions for product use to a learned intermediary. In addition, the appellants argue that they were entitled to their jury instruction regarding indemnification because Ohio law provides where one joint tortfeasor is actively negligent while another is only passively negligent, the passively negligent tortfeasor has a right of common law indemnity against the active tortfeasor.
 {¶ 86} Although the appellants contend that they were entitled to submit their proposed jury instructions, we cannot agree. Generally, the trial court should give requested instructions if they are a correct statement of the law applicable to the facts in the case. Murphy v. Carrolton Mfg.Co. (1991), 61 Ohio St.3d 585. The appellants' proposed jury instruction concerning the learned intermediary doctrine was a misstatement of the law. It read:
 {¶ 87} "The seller of a medical device satisfies its duty of ordinary care to the patient when it provides an adequate warning, through written instructions for use, to a learned intermediary such as a doctor. Therefore, if you find that Stryker and Mr. Baird provided written instructions for use to Dr. Sawhny, you must find in favor of Stryker and Mr. Baird."
 {¶ 88} The jury instructions ultimately submitted to the jury stated the following:
 {¶ 89} "Brett Baird is not negligent unless a failure to use ordinary care is provided by the greater weight of the evidence. A distributor of a medical product satisfies its duty of ordinary care to the patient when it provides an otherwise adequate warning and instruction to a doctor who uses the product."
 {¶ 90} The jury instructions actually submitted to the jury were in accordance with the applicable law regarding negligence of a manufacturer. The Ohio Supreme Court's holding inVaccariello, supra, provides the standard to which a manufacturer is held pursuant to the learned intermediary doctrine:
 {¶ 91} "The learned intermediary doctrine does not relieve the manufacturer of liability to the ultimate user for an inadequate or misleading warning; it only provides that the warning reaches the ultimate user through the learned intermediary."
 {¶ 92} It is clear from the applicable law that the appellants' jury instruction regarding the learned intermediary doctrine was not an accurate statement of the law. Brett Baird needed to provide Dr. Sawhny with an adequate warning to be relieved from liability. In this instance, providing a physician in the midst of an operation with a product that contains written instructions for use did not constitute an adequate warning. As a sales representative working in an operative setting, Baird had a duty to instruct the physician regarding the proper use of the product. His own deposition confirmed this duty. It is clear from his own testimony regarding instructions for use that, in his capacity as a sales representative, merely providing written instructions for use was not adequate.
 {¶ 93} Accordingly, the trial court was not in error when it refused to submit the appellants' proposed jury instructions to the jury. The trial court did not abuse its discretion regarding the appellants' instruction concerning non-delegable duty because the principle of non-delegable duty was immaterial to the case. When considering whether to use a jury instruction, it is within the sound discretion of the trial court to refuse to admit proposed jury instructions which are either redundant or immaterial to the case. Youssef v. Parr, Inc. (1990),69 Ohio App.3d 679. Accordingly, a reviewing court will not reverse unless an instruction is so prejudicial that it may induce an erroneous verdict. Id. After reviewing the appellant's proposed jury instruction, the trial court felt that it was immaterial to the case and chose to exclude it.
 {¶ 94} Non-delegable duties generally fall into one of two categories: (1) affirmative duties that are imposed on the employer by statute, contract, franchise, charter, or common law and (2) duties imposed on the employer that arise out of the work itself because its performance creates dangers to others, i.e., inherently dangerous work. Albain v. Flower Hosp. (1990),50 Ohio St.3d 251. If the work to be performed fits into one of these two categories, the employer may delegate the work to an independent contractor, but he cannot delegate the duty. In other words, the employer is not insulated from the liability if the independent contractor's negligence results in a breach of the duty." Id.
 {¶ 95} The appellant's proposed jury instruction regarding non-delegable duty stated that Ohio law mandates that a surgeon has a non-delegable duty to see that an operation is performed with due care. The non-delegable duty jury instruction is not applicable to this case. Dr. Sawhny was not the appellants' employer or supervisor; likewise, the appellants were not Dr. Sawhny's agents or representatives. It is clear that the appellants' proposed instruction is not applicable to this case. Thus, the trial court did not abuse its discretion in refusing to submit it to the jury.
 {¶ 96} Lastly, the appellant's proposed jury instruction concerning indemnification was properly excluded because it was also immaterial to the case. The appellants are correct in finding that Ohio law holds that where one joint tortfeasor is actively negligent while another is only passively negligent, the passively negligent tortfeasor has a right of indemnity against the active tortfeasor. The Glove Indemnity Co. v. Schmitt
(1944), 142 Ohio St. 595.
 {¶ 97} Although the appellants are correct in their statement of the law, they are incorrect in its application to the present case. The plaintiffs filed a complaint alleging active negligence against both the appellants and Dr. Sawhny. Because both parties were actively negligent, the jury instruction regarding indemnification is not applicable because it references one party being passively negligent. Accordingly, the trial court did not abuse its discretion when it refused to submit the instruction to the jury.
 {¶ 98} It is clear that the trial court's refusal to submit the appellants' proposed instructions to the jury was neither unreasonable, arbitrary, nor unconscionable. Thus, the trial court did not abuse its discretion, and the appellants' eleventh assignment of error is without merit.
 {¶ 99} "XII. The trial court abused its discretion when it refused to give, at Stryker's request, jury interrogatories regarding each of the elements of negligent misrepresentation. (Stryker's proposed jury interrogatories, Nos. 4-7, Nov. 12, 2004; Trial Tr. at 1743-46.)"
 {¶ 100} In their final assignment of error, appellants Stryker and Brett Baird argue that the trial court abused its discretion when it refused to submit to the jury interrogatories regarding each element of negligent misrepresentation. More specifically, the appellants assert that the trial court violated the mandates of Civ.R. 49(B) when it failed to submit the interrogatories.
 {¶ 101} Although the appellants argue that the trial court's actions constituted an abuse of discretion, we do not agree. Civ.R. 49(B) provides:
 {¶ 102} "The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party, prior the commencement of argument."
 {¶ 103} Although Civ.R. 49(B) allows for the submission of interrogatories, it does not require a trial judge to act as a "mere conduit who must submit all interrogatories counsel may propose." Ramage v. Cent. Ohio Emergency service, Inc. (1992),64 Ohio St.3d 97. It is clear that the trial court may exercise its discretion in submitting counsel's proposed interrogatories.
 {¶ 104} In the present case, the appellants submitted four separate interrogatories concerning negligent misrepresentation. Instead of submitting all of the interrogatories, the trial court exercised its discretion and only submitted one to the jury. The appellants were fully aware of the content of the interrogatory that was submitted to the jury and never objected to it. Further, the jury found the appellants guilty of negligence, rather than negligent misrepresentation.
 {¶ 105} The trial court's actions were neither unreasonable, arbitrary nor unconscionable. It was within the trial court's discretion to limit the interrogatories submitted to the jury, and the appellants did not object to the interrogatory that was submitted. Accordingly, the trial court did not abuse its discretion, and the appellants' twelfth assignment of error is without merit.
 Assignments of Error of Bhupinder Sawhny and Neurological Associates Inc. {¶ 106} "I. The trial court incorrectly permitted Stryker's expert witness to testify regarding hearsay statements."
 {¶ 107} In their first assignment of error, these appellants argue that the trial court incorrectly permitted Stryker's expert witness to testify. They assert that the trial court allowed Stryker's expert witness, Peter Catalano, to testify regarding the opinion of another expert witness, who did not testify at trial.
 {¶ 108} Pursuant to Evid.R. 801(C), "hearsay" is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(B) defines "declarant" as a person who makes a statement; and a "statement," as defined in Evid.R. 801(A), is: (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.
 {¶ 109} Hearsay evidence is genuinely inadmissible unless an exception is determined to be applicable. Evid.R. 803(4) provides that "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" serve as an exception to the hearsay rule.
 {¶ 110} Although the appellants argue that Dr. Catalano's testimony was barred as hearsay, we disagree. Although Dr. Catalano's testimony technically constituted hearsay, his statements were cumulative, thus it was harmless error because his statements did not prejudice Dr. Sawhny. Dr. Sawhny argues that the trial court erred in permitting Dr. Catalano to present testimony stating that he deviated from the accepted standard of care when treating Basil; however, Dr. Catalano did not offer such testimony. He testified that, according to Dr. Constantino, one of Basil's treating physicians, a wire mesh should have been used to secure the BoneSource product to the skull, and a drain should have been used to aid in the post operative process. Although Dr. Catalano's statements regarding Dr. Contantino's opinion technically constituted hearsay, the same opinion was advanced throughout the trial by several experts, including Dr. Sawhny himself and his own expert witnesses. Dr. Sawhny and his expert witnesses testified that the wire mesh and a post operative drain should have been used, and the failure to do so caused damage to Basil's skull. Although Dr. Sawhny attributed his failure to use wire mesh and a drain to Brett Baird and Stryker's inadequate instructions, the fact remains that Dr. Sawhny admitted that the failure to use wire mesh and a drain proximately caused the appellees' damages.
 {¶ 111} The Ohio Supreme Court held in State v. Williams
(1988), 38 Ohio St.3d 346, that the erroneous admission of inadmissable hearsay that is cumulative to properly admitted testimony constitutes harmless error. It is clear that Dr. Catalano's statements were cumulative and fell within the harmless error exception defined by Williams. Several qualified expert witnesses testified that wire mesh and a post operative drain should have been used in treating Basil. Although Dr. Catalano's testimony was hearsay, his statements merely echoed testimony properly admitted by previous expert witnesses. Accordingly, the trial court did not err when it admitted Dr. Catalano's testimony, and the appellants' first assignment of error is without merit.
 {¶ 112} "II. The trial court incorrectly precluded Dr. Sawhny from introducing into evidence Plaintiff's expert witness's testimony that supported Dr. Sawhny's care and treatment."
 {¶ 113} Here the appellants argue that the trial court erred when it precluded Dr. Sawhny from introducing into evidence expert testimony supporting his care and treatment of Basil. The appellants assert that Dr. Michael Levy was identified as an expert witness for the appellees, and his report contained information supporting Dr. Sawhny's position that he exercised the requisite standard of care when treating Basil. The appellants assert that, after reading Dr. Levy's report, they were relying upon his testimony; however, the appellees decided to withdraw Dr. Levy as an expert witness. In response, the appellees attempted to submit Dr. Levy's deposition into evidence; however, the trial court declined their request. The appellants contend that the trial court erred and essentially abused its discretion when it refused to allow them to present Dr. Levy's testimony by way of his deposition.
 {¶ 114} To constitute an abuse of discretion, the ruling must be more than legal error; it must be unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 50 OBR 481, 450 N.E.2d 1140.
 {¶ 115} "The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations." State v. Jenkins (1984),15 Ohio St.3d 164, 222, quoting Spalding v. Spalding (1959),355 Mich. 382, 3843-85. In order to have an abuse of that choice, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias. Id.
 {¶ 116} Although the appellants contend that the trial court abused its discretion when it excluded Dr. Levy's testimony, this court cannot agree. Dr. Levy's testimony mirrored that given by Dr. Sawhny, as well as two other expert witnesses called to testify on Dr. Sawhny's behalf. Although portions of Dr. Levy's testimony would have supported Dr. Sawhny's position that he exercised the proper standard of care, the evidence was cumulative, and a trial court may exercise its discretion to exclude such evidence.
 {¶ 117} In light of the cumulative nature of the evidence, the trial court's exclusion of Dr. Levy's deposition was neither unreasonable, arbitrary nor unconscionable. Accordingly, the trial court did not abuse its discretion, and the appellants' second assignment of error is without merit.
 {¶ 118} "III. The trial court incorrectly refused to instruct the jury on Ohio law with regard to the fact that a surgeon is not ultimately responsible for all decisions made in the operation room."
 {¶ 119} Lastly, the appellants argue that the trial court erred when it incorrectly refused to instruct the jury. Specifically, they argue that the trial court failed to instruct the jury to the effect that a surgeon is not ultimately responsible for all decisions made in the operating room. The appellants contend that the trial court's actions constituted an abuse of discretion because current Ohio law rejects the argument that a surgeon holds ultimate responsibility.
 {¶ 120} Although the appellants assert that the trial court abused its discretion when it failed to instruct the jury, we find the appellants' argument without merit. The appellants proposed that the following instruction be submitted to the jury:
 {¶ 121} "An operating physician does not have the duty of overseeing what occurs in the operating room. The operating physician is only responsible for the actions of those people over which he had direction and control.
 {¶ 122} "If Baird had the right to direct and control the performance of his own duties, then Dr. Sawhny is not responsible for Brett Baird's acts or failure to act."
 {¶ 123} The appellants argue that their jury instruction is in line with the Ohio Supreme Court's holding in Baird v.Sickler (1982), 69 Ohio St.2d 652, 655, regarding vicarious liability. Baird states in pertinent part:
 {¶ 124} "We make no attempt to impose upon an operating physician the duty of overseeing all that occurs in the highly technical milieu in which he works. Instead, we seek only to insure that where, in the operating room, a surgeon does control and realistically possesses the right to control events and procedures, he does so with a high degree of care." Id.
 {¶ 125} The appellants could not submit the proposed instruction to the jury because the appellees did not allege vicarious liability in their claim. The appellees did not assert a claim against Dr. Sawhny under the theory that Brett Baird was a loaned servant. The appellees never asserted the argument that Dr. Sawhny had control over Baird, or that Dr. Sawhny was liable for negligence that Baird committed, but rather asserted a negligence claim against both parties. The jury's verdict mirrored the appellees' claim. The jury did not find vicarious liability, but rather found that appellants Dr. Sawhny and Neurological Associates, as well as appellants Stryker and Brett Baird, were individually liable to different degrees for the appellees' damages.
 {¶ 126} It is clear from the language of the proposed jury instruction, as well from as the pertinent case law, that the appellants' instruction was not applicable to the present case. Their instruction would allow the jury to evaluate the theory of vicarious liability when it was not an aspect of the case. Accordingly, the trial court's action was neither unreasonable, arbitrary nor unconscionable when it did not allow the instruction to be submitted to the jury. Thus, the trial did not abuse its discretion.
 {¶ 127} Because we find no merit to any of the assignments of error presented by the appellants in these consolidated appeals, we affirm the judgment of the trial court.
Judgement affirmed.
It is ordered that appellees recover of appellants costs herein taxed.
The Court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Gallagher, J., and Kilbane, J., concur.