[Cite as *Whitmer v. Zochowski*, 2016-Ohio-4764.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Carl Whitmer, Individually and as Administrator for the Estate of Carl A. Whitmer, Deceased, | : | |
| | : | |
| Plaintiff-Appellee, | : | Nos. 15AP-52 and 65 (C.P.C. No. 12CV-8386) |
| v. | : | (REGULAR CALENDAR) |
| Adam Zochowski, M.D. et al., | : | |
| Defendants-Appellants. | : | |
| Carl Whitmer, Individually and as Administrator for the Estate of Carl A. Whitmer, Deceased, | : | |
| | : | |
| Plaintiff-Appellee, | : | No. 15AP-60 (C.P.C. No. 11CV-5260) |
| v. | : | (REGULAR CALENDAR) |
| Jeffrey H. Donaldson, M.D. et al., | : | |
| Defendants-Appellees, | : | |
| (Mount Carmel Health Systems, | : | |
| Defendant-Appellant). | : | |

## D E C I S I O N

### Rendered on June 30, 2016

**On brief:** *Colley Shroyer & Abraham Co., LPA*, and *David I. Shroyer*, for plaintiff-appellee Carl Whitmer, Individually and as Administrator of the Estate of Carl A. Whitmer, Deceased. **Argued:** *David I. Shroyer*.

**On brief:** *Hanna, Campbell & Powell, LLP, Douglas G. Leak*; *Hammond, Sewards & Williams*, and *Frederick A. Sewards*, for defendants-appellants Adam M. Zochowski,

M.D., and Central Ohio Surgical Associates, Inc. **Argued:** *Douglas G. Leak.*

**On brief:** *Reminger Co., LPA*, *Warren M. Enders* and *Tyler Tarney*, for defendant-appellant Mount Carmel Health Systems. **Argued:** *Warren M. Enders.*

---

APPEALS from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendants-appellants, Adam M. Zochowski, Central Ohio Surgical Associates, Inc., and Mount Carmel Health Systems ("Mount Carmel"), appeal a judgment of the Franklin County Court of Common Pleas in favor of plaintiff-appellee, Carl Whitmer.[1] For the following reasons, we affirm that judgment.

{¶ 2} In the early morning of May 8, 2010, Carl A. Whitmer crashed his automobile. First responders transported Whitmer to the emergency department of Mount Carmel West. Upon his admission, Whitmer was diagnosed with facial fractures, a left clavicle fracture, and traumatic brain injury. The traumatic brain injury that Whitmer sustained included a frontal lobe contusion, a left occipital lobe contusion, a small subarachnoid hemorrhage, and a subdural hematoma.

{¶ 3} A subdural hematoma forms when blood vessels on the surface of the brain tear, causing blood to collect between the brain and the dura, which is a membrane surrounding the brain. Whitmer's subdural hematoma, which was on his left side, exerted a mass effect on his brain: it pushed his brain to the right. Physicians measure the extent of that displacement by determining the midline shift, i.e., the distance the subdural hematoma pushes the middle structures of the brain away from the brain's center line. Whitmer's CT scans from immediately after the accident showed a midline shift of eight millimeters.

{¶ 4} Dr. Mark Fleming, a neurosurgeon, examined Whitmer and reviewed Whitmer's initial CT scan results. During his examination, Fleming observed no focal

---

[1] Carl Whitmer sued defendants as an individual and as the administrator for the estate of Carl A. Whitmer. Carl Whitmer is the father of the decedent, Carl A. Whitmer. Throughout this decision, we will refer to Carl A. Whitmer as "Whitmer." We will call Carl Whitmer by his full name or refer to him as "plaintiff" or "Whitmer's father."

signs, which are indicators of neurological deficits. Focal signs include weakness or paralysis, particularly on the side of the body controlled by the side of the brain injured; garbled speech; and the inability to understand speech. Fleming determined that Whitmer's subdural hematoma was not significant enough in volume or effect to justify surgical removal.

{¶ 5} After initial treatment in the emergency department, Whitmer was transferred to the neurological intensive care unit ("ICU"), where he was intubated and sedated. Whitmer remained in a coma for the next few days.

{¶ 6} On May 9, Whitmer underwent another CT scan. That CT scan showed a decrease in the midline shift from eight millimeters to five millimeters. The next CT scan, taken May 12, showed no significant change from the May 9 CT scan.

{¶ 7} Also on May 9, Dr. Jeffrey Donaldson, a plastic surgeon, examined Whitmer. Based on his examination and Whitmer's CT scans, Donaldson determined that a portion of Whitmer's eye socket was dislocated and Whitmer's upper maxilla, which includes the upper teeth, was detached from the rest of his skull. Donaldson recommended that Whitmer receive surgery to correct these issues within 7 to 14 days.

{¶ 8} Whitmer began to exhibit signs of consciousness on May 12. Whitmer became more awake and aware as the next two days passed.

{¶ 9} On May 14, Fleming, the neurosurgeon who had evaluated Whitmer upon his admission to the hospital, reexamined Whitmer. Fleming concluded that Whitmer was making "steady progress," and he ordered that a new CT scan be performed in two weeks. (Pl.'s Ex. 1, May 14, 2010 Neurosurgery Progress Note.) Fleming also pronounced Whitmer ready to leave the ICU and begin rehabilitation.

{¶ 10} On May 15, Whitmer was transferred from the ICU to the neurological stepdown unit. While in the ICU, Whitmer had received the pain medication Dilaudid intravenously. However, in the stepdown unit, Whitmer began receiving pain medication orally. The trauma surgeon assigned to Whitmer ordered the administration of one to two tablets of 5-325 milligram Percocet every four hours, as needed.[2] The trauma surgeon

---

[2] A 5-325 milligram Percocet tablet includes five milligrams of oxycodone and 325 milligrams of acetaminophen.

also allowed the administration of one tablet of 625 milligrams of acetaminophen every four hours, as needed.  Whitmer did not request any pain medication on May 16, 17, or 18.

{¶ 11} On May 17, Dr. Adam Zochowski, a trauma surgeon, replaced the previous trauma surgeon assigned to Whitmer.  When a patient has multiple serious injuries, such as Whitmer, the trauma surgeon assigned to the patient oversees and coordinates the treatment of the patient.  The trauma surgeon calls on specialists to consult regarding the patient's injuries and determines when the patient will undergo necessary treatment.  Moreover, the trauma surgeon examines the patient each day during rounds.  The trauma surgeon leads the trauma service, which, in this case, included two residents.

{¶ 12} By May 17, Whitmer's condition was stable, and he was cleared for surgery to fix his facial fractures.  Whitmer agreed to the surgery, which was scheduled for May 19.  However, on the morning of the surgery, Whitmer refused to go forward.  Whitmer's father tried to talk him into having the surgery, but Whitmer was too scared.

{¶ 13} Also on May 19, after three days of refusing pain medication, Whitmer began requesting that medication.  At 1:29 a.m., Whitmer described his pain as a nine out of ten and said he hurt "all over."[3]  (Mount Carmel Ex. 3, Medication Administration Record for May 19, 2010.)  A nurse gave him one Percocet tablet.  At 10:01 a.m., Whitmer complained of ten-out-of-ten pain "all over."  *Id.*  In response, a nurse gave Whitmer two Percocet tablets.  Then, at 5:51 p.m., Whitmer complained of eight-out-of-ten pain in his face, and a nurse gave him two Percocet tablets.  By the end of the day, Whitmer had taken five tablets of Percocet.

{¶ 14} On May 20, Whitmer again complained of pain and sought pain medication.  At 9:19 a.m., Whitmer complained of five-out-of-ten pain "all over."  (Mount Carmel Ex. 4, Medication Administration Record for May 20, 2010.)  At 2:57 p.m., Whitmer complained of a ten-out-of-ten headache and pain "all over."  *Id.*  At 10:15 p.m., Whitmer complained of a ten-out-of-ten headache.  Each time Whitmer complained of pain, a nurse gave him two Percocet tablets, so by the end of the day, Whitmer had taken six tablets of Percocet.

---

[3]  To gauge Whitmer's level of pain, the nurses asked him to rate his pain on a scale of one to ten, with ten representing the worst pain he had felt in his life.

{¶ 15} On May 21, the number of Whitmer's pain complaints increased, and the pain medication appeared to have less effect. At 6:30 a.m., Whitmer complained of an eight-out-of-ten headache. A nurse gave him one tablet of acetaminophen. At 9:40 a.m., he complained of ten-out-of-ten pain "everywhere." (Mount Carmel Ex. 5, Medication Administration Record for May 21, 2010.) This time, Whitmer received two Percocet tablets, but he continued to complain of ten-out-of-ten pain when a nurse checked on him at 10:40 a.m. At 2:35 p.m., Whitmer complained of a seven-out-of-ten headache. The nurse gave Whitmer a tablet of acetaminophen, but an hour later, at 3:35 p.m., Whitmer was suffering ten-out-of-ten pain. At 5:11 p.m., Whitmer was again complaining of a ten-out-of-ten headache. A nurse gave him two Percocet tablets. At 9:10 p.m., Whitmer was suffering from a six-out-of-ten headache. Again, he received two Percocet tablets. By the end of May 21, Whitmer had taken two tablets of acetaminophen and six tablets of Percocet.

{¶ 16} According to the family members and friends who visited Whitmer on May 19, 20, and 21, Whitmer was suffering from increasingly severe headaches over the course of those three days. On May 19, Whitmer told his sister, Melanie Hoover, that his head was bothering him. Hoover recalled that, the next day, Whitmer was more agitated about the headache, and he did not want the lights on or blinds open. On May 21, Whitmer said that his head felt "like it [was] going to explode" and he was in "the worst pain [he had] felt in [his] life." (Tr. Vol. IV at 208.)

{¶ 17} Whitmer's friend, Chad Lewis, visited Whitmer in the late afternoon of May 21. Lewis described Whitmer holding his head and rolling back and forth in bed. Whitmer repeatedly said "that his head was freaking killing him." (Tr. Vol. IV at 178.) Whitmer's father recollected that on May 21:

> Carl was complaining of headaches. The lights were off, blinds were shut, his head was covered and he was complaining of severe headaches. He said at one time his freaking head was killing him, if he had a gun he would blow his head off. * * * [I]f you were in there, you had to keep it at a whisper. The TV wasn't allowed to have the sound on. * * * [H]e was just very agitated if he got noise or people talking loud.
>
> * * *

> His blankets were basically pulled up over his head, and every
> once in a while he would say something or talk to you, but not
> too often, but other than to complain about his pain.

(Tr. Vol. VII at 230-31.)

{¶ 18} According to a note in Whitmer's medical record, Whitmer refused to participate in physical therapy on May 21. At noon, the physical therapist found Whitmer with his head covered by a blanket, his eyes barely open. At 4:00 p.m., Whitmer agreed to get up, but he then changed his mind.

{¶ 19} Meanwhile, Whitmer's parents convinced him that he needed plastic surgery before the broken bones in his face healed in the wrong position. On May 20, Whitmer's father asked Donaldson, the plastic surgeon, to reschedule the surgery, and Donaldson agreed. Donaldson set the surgery for May 22.

{¶ 20} On May 20 and 21, Zochowski, the trauma surgeon assigned to Whitmer, examined Whitmer during his rounds. Zochowski's progress notes from May 20 and 21 do not include any mention of Whitmer's increasingly severe headaches. At no point during those two days did Zochowski contact Fleming, the neurosurgeon, to inform him of the rescheduled surgery or ask Fleming to clear Whitmer for the rescheduled surgery. Fleming last saw Whitmer on May 19, and thus, he did not know that the surgery had been rescheduled.

{¶ 21} Donaldson operated on Whitmer on May 22. According to Donaldson, in a discussion held prior to surgery, the trauma service informed him that Whitmer was cleared for the surgery from a neurological standpoint. The trauma service also told Donaldson that no clinically relevant changes in Whitmer's condition had occurred since May 19, when the initial surgery was cancelled.

{¶ 22} No apparent problems arose during surgery. However, after surgery, Whitmer did not wake up. A CT scan was performed, which showed a large subdural hematoma exerting significant pressure on Whitmer's brain. In contrast to his earlier CT scans, which showed midline shifts of eight millimeters (May 8) and five millimeters (May 9 and 12), the May 22 CT scan showed a midline shift of 15 millimeters.

{¶ 23} Fleming sought and received consent from Whitmer's father to perform emergency surgery to relieve the intracranial pressure. Fleming performed a burr hole surgery, in which he drilled a hole in Whitmer's skull and made a stab incision in the dura.

According to Fleming, "[w]ith placement of the stab incision, dark-colored bloody fluid sprayed out in a fountain initially over 2 feet in length, and gradually diminishing as further fluid pumped out." (Pl.'s Ex. 1, Fleming Operative Report.) Whitmer never regained consciousness. He died on May 30, 2010.

{¶ 24} On April 27, 2011, Carl Whitmer, acting individually and on behalf of his son's estate, sued Donaldson, Donaldson Plastic Surgery, LLC (hereinafter "the Donaldson defendants"), and Mount Carmel. Plaintiff asserted a claim for wrongful death against all defendants. In addition to suing Mount Carmel for the negligence of its nurses, plaintiff also alleged that Mount Carmel was vicariously liable for Donaldson's negligence under the doctrine of agency by estoppel. On June 29, 2012, Carl Whitmer, acting individually and on behalf of his son's estate, sued Zochowski and Central Ohio Surgical Associates, Inc. ("COSA") for wrongful death.[4] The trial court consolidated the two actions.[5]

{¶ 25} The parties tried the case to a jury from July 29, 2014 to August 8, 2014. During the trial, plaintiff presented the testimony of two expert witnesses. Dr. Jack Gelman testified as to the standard of care applicable to trauma surgeons. According to Gelman, that standard of care requires trauma surgeons to know about the type and extent of pain their patients experience and how much pain medication the patient consumes. Trauma surgeons can discover that information from talking with the nurses who are caring for the patient or reviewing the medication administration record ("MAR"). The MAR is an electronic record in which the nursing staff documents the type and dosage of each medication a patient takes, when the patient takes the medication, and which nurse gives the patient the medication. When the medication taken treats pain, the MAR also includes an assessment of the patient's pain level prior to and after the patient receives the medication.

{¶ 26} Gelman also testified that, under the standard of care, Whitmer's complaints of ten-out-of-ten headaches on May 20 and 21 should have prompted Zochowski to consult with a neurosurgeon. In response to the question about what a

---

[4] Zochowski is an employee of COSA, which provides its employees' services to Mount Carmel under a contract. Hereinafter, we will refer to Zochowski and COSA as "the Zochowski defendants."

[5] We recognize that the consolidated case involved three actions, not just two. As the third action is irrelevant to this appeal, we will not refer to it in this decision.

trauma surgeon should do upon learning of the headaches like the ones Whitmer suffered, Gelman stated:

> [S]tandard of care would be to call neurosurgery when a patient has a known subdural [hematoma] who has been followed or was initially followed by neurosurgery, you would call them back. * * * [You call neurosurgery] [b]ecause this is a change and it's a headache and it could be a sign of changes from that. It's not your place as the general surgeon to figure this out, but that's why you have a neurosurgeon to figure out what's going on.

(Tr. Vol. III at 78.)

{¶ 27} Finally, Gelman testified that the standard of care required neurosurgery to receive notice that Whitmer's surgery had been rescheduled for May 22. Such notice was necessary so that a neurosurgeon could clear Whitmer for the rescheduled surgery.

{¶ 28} In addition to Gelman's testimony, plaintiff offered the expert testimony of Dr. Stephen M. Bloomfield, a neurosurgeon. Bloomfield explained that a subdural hematoma has a jelly-like consistency in the acute phase, which begins immediately after the blood vessel tears. As the subdural hematoma heals, the clotted blood liquefies and then washes away. However, in 25 percent of patients who suffer subdural hematomas, the subdural hematoma does not resolve itself. Rather, approximately 10 to 14 days after the precipitating injury, the subdural hematoma advances to the chronic stage, where it draws fluid into the subdural space and expands.

{¶ 29} A chronic subdural hematoma has the consistency of crankcase oil. Due to that consistency, a neurosurgeon can remove a chronic subdural hematoma through a burr hole surgery. When a dime-size hole is made in the skull and dura, the liquid mass will squirt out. Because an acute subdural hematoma is more jelly-like, burr hole surgery will not work. Bloomfield pointed to Fleming's observation of fluid spraying out during Whitmer's burr hole surgery as evidence that Whitmer's subdural hematoma had advanced to the chronic stage.

{¶ 30} Bloomfield also based his diagnosis of a chronic subdural hematoma on Whitmer's May 22 CT scan. The substance that makes up a chronic subdural hematoma is less dense than the brain, so it appears darker than the brain on a CT scan. An acute subdural hematoma, which is denser than the brain, appears bright compared to the

brain.    On Whitmer's May 22 CT scan, the subdural hematoma was darker than Whitmer's brain.

{¶ 31} According to Bloomfield, the progression of Whitmer's subdural hematoma from acute to chronic occurred gradually until Whitmer's May 22 surgery, which caused a precipitous increase in intracranial pressure.  Bloomfield explained that after Whitmer's surgery and removal from the ventilator, the anesthesia still in Whitmer's system suppressed his breathing, which resulted in the rise of the carbon dioxide levels in Whitmer's blood.  The increased carbon dioxide caused Whitmer's blood vessels to dilate, which raised the volume of blood in his brain, thus creating higher intracranial pressure. Additionally, Bloomfield stated that the fluids Whitmer received during surgery also could have heightened the intracranial pressure and contributed to the sudden worsening of Whitmer's condition.  Higher intracranial pressure tips a patient such as Whitmer "over the edge, causing their brain stem no longer to tolerate the pressures."  (Tr. Vol. V at 83.) In Whitmer's case, the pressure on his brain stem led to his death.

{¶ 32} Bloomfield opined that, given the dangers of surgery to a patient in Whitmer's condition, the standard of care called for clearance from a neurosurgeon prior to surgery.  The clearance given for the May 19 surgery did not apply to the May 22 surgery because "the 22nd is three days later, and a lot of things can change in that time, especially because we know that chronic subdural hematomas can form to become larger and larger in 25 percent of patients with these acute subdurals."  (Tr. Vol. V at 93.)

{¶ 33} Additionally, Bloomfield stated that a neurosurgeon asked to provide a clearance for the May 22 surgery would have, pursuant to the standard of care, ordered a CT scan whether or not Whitmer had been suffering from headaches.  Bloomfield elaborated:

> [W]e know that about a quarter of the patients, one out of four patients, with an acute subdural hematoma is going to form an expanding chronic subdural hematoma.
>
> So with a 25 percent or so chance risk -- especially because we know that those chronic subdural hematomas form about two weeks after the injury -- we would certainly want to get a CAT scan before placing the patient at the risks of a semi-elective surgery, like the facial fracture surgery, two weeks after his injury.

(Tr. Vol V at 85.)

{¶ 34} Bloomfield further stated that a neurosurgeon informed of Whitmer's ten-out-of-ten headaches would have, pursuant to the standard of care, ordered a CT scan regardless of whether surgery was impending. Bloomfield explained:

> Even if the patient wasn't going to go for surgery, a CAT scan would be performed if there was any change in the level of their consciousness or any change in the level of their pain, especially a person who has had significantly less pain for a while, around one week after the injury, and then starts to have progressive increases in pain and progressive requirement of pain medications to handle that.

(Tr. Vol. V at 86.)

{¶ 35} According to Bloomfield, a CT scan taken on May 21 would have shown a large chronic subdural hematoma with a midline shift much larger than in the prior CT scans. Under the standard of care, a neurosurgeon would have then conducted a detailed neurological evaluation of Whitmer. The evaluation would have uncovered that Whitmer had lost his ability to see to the right in both eyes. This condition, known as homonymous hemianopsia, is a focal neurological deficit that occurred in Whitmer because the subdural hematoma pressed against his left occipital lobe. Bloomfield explained that, in his experience, approximately half the patients with homonymous hemianopsia do not realize that they have the condition.

{¶ 36} Based on the results of the CT scan and the detailed neurological evaluation, a neurosurgeon practicing pursuant to the standard of care would have performed an emergency burr hole surgery. The surgery would have relieved the intracranial pressure caused by the subdural hematoma, and Whitmer would have lived.

{¶ 37} To prove that Zochowski breached the standard of care, plaintiff called him to the stand. First, plaintiff's counsel asked Zochowski, "[T]here's nothing in your notes or from your memory about any sort of headache in this case; correct?" (Tr. Vol. IV at 82.) Zochowski answered, "Correct." *Id.* Plaintiff's counsel then focused on Whitmer's May 20 and 21 headaches, and asked Zochowski specifically about his contemporaneous knowledge of those headaches. Zochowski replied that he could not say that he was not aware of the headaches on the dates they occurred. To impeach this testimony, plaintiff's attorney referred Zochowski to his deposition testimony with regard to the May 21

headaches. During Zochowski's deposition, plaintiff's counsel had asked, "Now looking at [the May 21] note as well as your memory on [May 21] did you have any sort of knowledge or did anybody ever tell you that [Whitmer] was having 10-out-of-10 headache pain?" (Tr. Vol. IV at 90.) Zochowski had answered, "No." *Id.* At trial, Zochowski explained that his "[n]o" answer meant that he had no memory of knowing about the headaches, but he could have known of the headaches at the time and subsequently forgotten that he knew. Despite this explanation, Zochowski then testified that he first learned of Whitmer's ten-out-of-ten headaches approximately three years after Whitmer's death, when he reviewed Whitmer's medical records while preparing for his deposition.

{¶ 38} Next, plaintiff's counsel elicited testimony about what Zochowski would have done if he had known of Whitmer's headaches. Plaintiff's counsel and Zochowski engaged in the following colloquy:

> Q: Is a 10-out-of-10 headache pain, sudden onset, in a patient that's got a subdural hematoma, is that something that would be significant?
>
> A: I would investigate that.
>
> Q: Yep. Now, if you had learned that he was having * * * headache pain, that would have been a new complaint; right?
>
> A: If I didn't know about it before and it was brought to me, that would have been a new finding or a new complaint.
>
> Q: In fact, you told me that on the 21st, if you have learned that he was having a headache, that would have been a new complaint.
>
> A: Correct.
>
> * * *
>
> Q: * * * If you had found out about a 10-out-of-10 headache, significant headaches, on [May 20 or 21] * * * you would have called Dr. Donaldson and said, ["]Hey, we've got a new finding. Would it be okay to hold off this procedure?["] That's what you would have done?
>
> A: I would have discussed it with him, sure.

Q: You * * * would have discussed it with him, and you would have said, ["]This is a new finding. Would it be okay to hold off the procedure?["]

A: Correct.

Q: And then you would have, then, also -- upon learning about 10-out-of-10 headaches, you would have, then, contacted the neurosurgeon. But before doing that, you would have asked the nurse, ["]Have you called neurosurgery?["] And if the nurse hadn't, you would have instructed her to call neurosurgery; right?

A: Correct.

(Tr. Vol. IV at 91-93.) Zochowski admitted that he did not, in fact, contact neurosurgery on either May 20 or 21.

{¶ 39} At the close of plaintiff's case, the Zochowski defendants moved for directed verdict. The Zochowski defendants argued that Gelman was unqualified to opine regarding the standard of care for a trauma surgeon because Gelman practiced as a plastic surgeon. Without Gelman's testimony, plaintiff lacked any evidence regarding the standard of care applicable to Zochowski. Thus, asserted the Zochowski defendants, plaintiff could not prove his claim against them. The trial court denied the motion.[6]

{¶ 40} As the trial court did not direct a verdict for the Zochowski defendants, they proceeded with their case-in-chief. Called on direct, Zochowski testified that he normally discusses a patient's condition with the nursing staff, so he likely knew of Whitmer's headaches from those discussions. Zochowski also stated that, under the standard of care, Whitmer's headaches did not require Zochowski to request a consult with a neurosurgeon. Zochowski characterized Whitmer's pain as the sort of pain expected in a patient with multiple traumatic injuries. According to Zochowski, under the standard of care, a trauma surgeon need only seek a neurosurgical consult if a patient exhibits progressively worsening focal signs (described above) or global decompensation, which is a state of stupor or almost complete unresponsiveness. Focal signs and global

---

[6] The Zochowski defendants renewed their motion at the end of trial. The trial court failed to rule on the renewed motion, which we construe as a denial of the motion. *See Wells Fargo Bank, N.A. v. Rahman*, 10th Dist. No. 13AP-376, 2013-Ohio-5037, ¶ 18 (when a trial court does not expressly rule on a motion, appellate courts presume that the trial court denied it).

decompensation both signal an expanding subdural hematoma. Zochowski saw neither indicator in Whitmer during his May 20 and 21 examinations of Whitmer.

{¶ 41} The Zochowski defendants presented expert testimony from Dr. Charles Cook, a trauma surgeon. Cook concurred with Zochowski that the standard of care did not necessitate a neurosurgical consult. According to Cook, Whitmer's headaches were normal and expected given his injuries and not cause for involving neurosurgery or obtaining a CT scan. Cook saw nothing in Whitmer's medical records that led him to believe that Whitmer's subdural hematoma was expanding on May 20 or 21. In conclusion, Cook opined that Zochowski's overall care of Whitmer met the standard of care in every respect.

{¶ 42} The Zochowski defendants also relied on two expert witnesses to rebut Bloomfield's testimony. Dr. Owen Samuels, a physician specializing in neurosurgical critical care, countered Bloomfield's opinion that a neurosurgical consult was required before the May 22 surgery. Samuels stated that no such consult was necessary because Fleming had cleared Whitmer for the May 19 surgery, and, if Fleming had any objection to any plastic surgery that might occur on some later date, he would have noted his objection in his May 19 progress note.

{¶ 43} Samuels also testified that allowing Whitmer to undergo the May 22 surgery was within the standard of care. Like Zochowski and Cook, Samuels stated that Whitmer's increased pain did not present a change in condition that required attention from a neurosurgeon. According to Samuels, unless and until Whitmer exhibited focal signs or global decompensation, the standard of care did not call for a new neurosurgical consult or a delay of the plastic surgery.

{¶ 44} In addition to Samuels, the defense called Dr. Gregory Balko, a neuropathologist. Balko disagreed with Bloomfield's opinion regarding the cause of Whitmer's precipitous decline. According to Balko, Whitmer's existing subdural hematoma did not expand. Instead, a new bleed had occurred in Whitmer's brain at the same site as the subdural hematoma caused by the car accident. Balko determined that a second bleed had occurred because, during Whitmer's autopsy, two types of blood were found between Whitmer's brain and dura: blood with a jelly-like consistency and a darker, muddy blood. The jelly-like consistency indicated more recent blood, so Balko

concluded that a second bleed had occurred closer in time to Whitmer's death. Balko opined that the second bleed began while Whitmer was recovering from the plastic surgery because Whitmer did not evince any abnormal neurological function during surgery. This second bleed resulted in the compression of the brain stem, which ultimately caused Whitmer's death.

{¶ 45} Both plaintiff and defendants proposed jury instructions and interrogatories. Plaintiff's instructions and interrogatories addressed whether Mount Carmel was liable for Zochowski's negligence under the doctrine of agency by estoppel. During trial, plaintiff's attorney had elicited testimony relevant to that issue and Mount Carmel had not objected. When the trial judge and the parties discussed the instructions and interrogatories the jury would receive, plaintiff's attorney and Mount Carmel's attorney had the following exchange:

> [Mount Carmel's attorney]: [Agency by estoppel has] to be out to Zochowski, because [plaintiff] never alleged it in his complaint. * * * [Y]ou have to admit that you didn't allege that in the Zochowski complaint. So you can't get it now; right?
>
> [Plaintiff's attorney]: Well, no, I don't admit that. You can conform your pleadings to the evidence. * * * [T]he Court fashions the jury instructions. If I've got evidence of agency by estoppel, which we do in the case, then it comes out. I mean, I know of no case that says you have to plead that or you can't put that issue to the jury. It's an alternative, one of the many things that we go through trial to fashion out what ends up at the end.
>
> [Mount Carmel's attorney]: I don't know. I think it's something you have to plead, and it's always pled for people who want to recover on it, and you didn't plead it as to Zochowski, as you did to Donaldson.

(Tr. Vol. IX at 181-82.) The trial court never explicitly ruled on this issue. However, the trial court instructed the jury regarding agency by estoppel with regard to Zochowski, and the trial court submitted to the jury interrogatories relevant to that issue.

{¶ 46} After deliberating, the jury returned with a verdict finding the Donaldson defendants not liable. The jury also found Mount Carmel not liable for the alleged negligence of its nurses. However, the jury found the Zochowski defendants liable for negligence and awarded plaintiff $1.8 million in damages.

{¶ 47} Because the jury answered the interrogatories regarding agency by estoppel in plaintiff's favor, plaintiff orally requested that the verdict against the Zochowski defendants also apply to Mount Carmel. The trial court granted that motion. Subsequently, plaintiff filed a motion to amend the pleadings to conform to the evidence with regard to the agency-by-estoppel issue. The trial court also granted that motion.

{¶ 48} On September 5, 2014, the trial court entered judgment on the jury's verdict. Plaintiff then moved for prejudgment interest against the Zochowski defendants under R.C. 1343.03(C). After an evidentiary hearing on the motion, the trial court issued a judgment finding that plaintiff made a good faith effort to settle the case, but the Zochowski defendants did not. Thus, the trial court granted plaintiff's motion and awarded plaintiff $23,612.23 in prejudgment interest.

{¶ 49} Mount Carmel now appeals to this court and assigns the following errors:

> 1. The court erred in allowing Appellees read the deposition of Dr. Fleming—the *hero* of their case—into evidence because it violated the hearsay exception for former testimony and Civ.R. 32.
>
> 2. The judgment deeming Mount Carmel secondarily liable for Dr. Zochowski must be reversed because Appellees' amendment in 12-CV-8386—adding Mount Carmel as a party *and* an agency by estoppel claim—(1) did not relate back under Civ.R. 15(C); and (2) failed to satisfy Civ.R. 15(B).
>
> 3. The court erred in rejecting jury interrogatories approved by the Ohio Supreme Court and instead issuing ones not directed at determinative issues and inappropriate in form and content.
>
> 4. There was insufficient evidence to support the verdict against Dr. Zochowski because the only standard of care testimony offered by Appellees was a witness not sufficiently qualified or competent to render an expert trauma opinion.

(Emphasis sic.)

{¶ 50} The Zochowski defendants also appeal to this court and assign the following errors:

I. ASSIGNMENT OF ERROR NO. 1

The Trial Court abused its discretion in allowing Plaintiff to read a discovery deposition into evidence at which Dr. Zochowski was neither present nor represented by counsel[.]

II. ASSIGNMENT OF ERROR NO. 2

The Trial Court committed prejudicial error in submitting "multiple choice" narrative jury interrogatories as opposed to the requisite standard narrative jury interrogatory[.]

III. ASSIGNMENT OF ERROR NO. 3

The Trial Court abused its discretion in allowing the unqualified and incompetent expert testimony of Jack Gelman, M.D.

IV. ASSIGNMENT OF ERROR NO. 4

The Trial Court erred in denying Dr. Zochowski's Motion for a Directed Verdict[.]

V. ASSIGNMENT OF ERROR NO. 5

The Trial Court abused its discretion in prohibiting relevant evidence of Defendant's alcohol use at the time of the events and the fact that there was a single car accident[.]

VI. ASSIGNMENT OF ERROR NO. 6

The Trial Court abused its discretion in granting Plaintiff['s] Motion for Prejudgment Interest[.]

{¶ 51} If we decide Mount Carmel's second assignment of error in its favor, the remainder of Mount Carmel's assignments of error become moot. Consequently, we will address that assignment of error first.

{¶ 52} By its second assignment of error, Mount Carmel argues that the trial court erred in granting plaintiff's Civ.R. 15(B) motion to amend the pleadings to conform to the evidence. Mount Carmel essentially sets forth two arguments challenging the trial court's ruling. First, Mount Carmel argues that the lapse of the statute of limitations barred the trial court from amending the pleadings to reflect a claim against Mount Carmel pursuant to the doctrine of agency by estoppel. According to Mount Carmel, the running of the

statute of limitations means that the amendment has to fit within the parameters of Civ.R. 15(C) in order to relate back to the original filing date of the complaint.  Mount Carmel contends that Civ.R. 15(C) does not apply here, and consequently, plaintiff's amendment is untimely.

{¶ 53} Second, Mount Carmel argues that, even if the amendment relates back under Civ.R. 15(C), the amendment fails to meet the requirements of Civ.R. 15(B).  Mount Carmel maintains that it did not expressly or impliedly consent to litigation of its liability based on agency by estoppel with regard to Zochowski.  In addition, Mount Carmel argues that the amendment substantially prejudiced it.

{¶ 54} Mount Carmel did not assert its Civ.R. 15(C) argument before the trial court. Moreover, Mount Carmel failed to raise arguments on the issues of consent or prejudice in opposing the grant of Civ.R. 15(B) relief.  " 'Ordinarily, reviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed.' "  *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78, 81 (1997), quoting *Goldberg v. Indus. Comm.*, 131 Ohio St. 399, 404 (1936).  Thus, when a party could have raised an argument in the court below, but fails to do so, that party waives the ability to raise the argument on appeal.  *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, ¶ 34.  A party may not "sit idly by until he or she loses on one ground only to avail himself or herself of another on appeal." *Foreman* at 81.

{¶ 55} In its memorandum in opposition to plaintiff's Civ.R. 15(B) motion, Mount Carmel set forth only one argument:  plaintiff's motion was untimely because plaintiff knew of the facts that he offered to establish agency by estoppel for some time prior to trial.  As the untimeliness argument is the only argument Mount Carmel raised below, that is the only argument we will consider on appeal.  Mount Carmel waived all other arguments when it did not raise them before the trial court.

{¶ 56} Civ.R. 15(B) furthers the maxim that "cases are to be decided on the issues actually litigated at trial." *State ex rel. Evans v. Bainbridge Twp. Trustees*, 5 Ohio St.3d 41, 44 (1983).  Pursuant to Civ.R. 15(B):

> [w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.  Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may

> be made upon motion of any party at any time, even after judgment.  Failure to amend as provided herein does not affect the result of the trial of these issues.

Civ.R. 15(B) provides the " 'maximum opportunity for each claim to be decided on its merits rather than procedural niceties.' "  *Hall v. Bunn*, 11 Ohio St.3d 118, 121 (1984), quoting *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir.1982).  Thus, the rule must be liberally construed to allow amendment.  *Id.*; *Evans* at 44; *Wilson v. Mercy Med. Ctr.*, 5th Dist. No. 2015CA00010, 2015-Ohio-3928, ¶ 13.  Because a trial court exercises its discretion in deciding a Civ.R. 15(B) motion, appellate courts review such a decision for an abuse of discretion.  *Spisak v. McDole*, 15 Ohio St.3d 62, 63 (1984).

{¶ 57} Here, Mount Carmel did not expressly consent to trial of the agency-by-estoppel issue.  The operative question, therefore, is whether Mount Carmel impliedly consented to trial of that issue.  Implied consent may arise from an opposing party's failure to object to introduction of evidence bearing directly on the unpleaded issue.  *DeHoff v. Veterinary Hosp. Operations of Cent. Ohio, Inc.*, 10th Dist. No. 02AP-454, 2003-Ohio-3334, ¶ 128.  Thus, we turn to the law of agency by estoppel to determine what evidence plaintiff had to adduce to establish Mount Carmel's liability under that doctrine.  We then must determine whether plaintiff introduced such evidence without objection from Mount Carmel.

{¶ 58} Agency by estoppel is not a direct claim against a hospital, but an indirect claim by which the hospital is vicariously liable for the negligence of an independent contractor with whom the hospital contracted for professional services.  *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, ¶ 27.  A hospital is liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital when:  (1) the hospital holds itself out to the public as a provider of medical services, and (2) in the absence of notice or knowledge to the contrary, the patient looks to the hospital, as opposed to the individual practitioner, to provide competent medical care.  *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435 (1994), syllabus.

{¶ 59} Here, plaintiff relied on his own testimony to establish that agency by estoppel rendered Mount Carmel vicariously liable for Zochowski's negligence.  Plaintiff testified as follows:

Q: And how about the other doctors, who were they? -- did you have an understanding that they were with Mount Carmel?

A: Yes.

[Mount Carmel's counsel]: Objection, your Honor. This is a little bit leading.

THE COURT: It is.

[Plaintiff's counsel]: Okay.

Q: What was your understanding as to the other doctors, the trauma team service and Dr. Donaldson, what was your understanding about them and Mount Carmel?

A: I just thought they worked for Mount Carmel.

Q: Okay. Now, you heard in opening that there was this corporation; you had no knowledge of that?

A: No.

* * *

Q: And your -- the doctors that would show up in the room, did they have any -- how were they dressed?

A: White coats. I mean, basically all the same. White jackets, some of them were in scrubs, some of them ties.

Q: Did you get any indication from any of them, or from nametags or otherwise, that they were associated with anybody but Mount Carmel?

A: No.

Q: Were you looking to Mount Carmel for your care of your son?

A: Yes.

(Tr. Vol. VII at 216, 218-19.)

{¶ 60} The above-quoted testimony bears directly on whether Mount Carmel was liable under the doctrine of agency by estoppel for the negligence of the trauma service

physicians, which included Zochowski. Mount Carmel interposed no objection that the testimony exceeded the scope of the claims against it. That failure to object, however, is not necessarily determinative of whether Mount Carmel impliedly consented to trial of the agency-by-estoppel issue with regard to Zochowski. When an opposing party does not recognize the significance of the introduction of certain evidence and therefore fails to contest it, the resulting prejudice is such that the opposing party cannot be deemed to have given implied consent. *Evans*, 5 Ohio St.3d at 45-46. Thus, whether a party has impliedly consented to the trial of an unpleaded issue turns on whether the amendment would substantially prejudice that party. *Id.* at 45. To determine whether substantial prejudice exists, a court must consider whether: (1) the opposing party recognized that an unpleaded issue had entered the case, (2) the opposing party had a fair opportunity to address the tendered issue or would offer additional evidence if the case were to be retried on a different theory, and (3) the witnesses were subjected to extensive cross-examination on the issue. *Id.* at 45-46.

{¶ 61} As we stated above, in opposing plaintiff's motion in the trial court, Mount Carmel only attacked the timing of the amendment. Delay in raising an unpleaded issue may prejudice an opposing party, particularly when that delay impedes the opposing party's ability to marshal evidence against the unpleaded issue. Mount Carmel, however, did not claim that plaintiff's delay interfered with Mount Carmel's presentation of evidence. Indeed, Mount Carmel did not argue that the belated amendment prejudiced it in any way. Mount Carmel's argument, then, sought denial of plaintiff's motion simply because plaintiff waited too long to introduce the agency-by-estoppel issue into the case. In other words, Mount Carmel argued that a denial of plaintiff's motion was necessary to sanction plaintiff for his delay, not to safeguard Mount Carmel against substantial prejudice.

{¶ 62} Civ.R. 15(B) allows the trial court to amend the pleadings to reflect all the issues, including those issues belatedly introduced and litigated at the trial. Because every Civ.R. 15(B) motion seeks to add untimely raised issues to the pleadings, the focus of Civ.R. 15(B) is not on the moving party's delinquency, but on the opposing party's opportunity to fully contest the unpleaded issue. In the interest of having cases decided on the merits, Civ.R. 15(B) allows untimely amendments, but only if the amendment will

not substantially prejudice the opposing party. As Mount Carmel did not identify any prejudice, we find no abuse of discretion in the trial court's grant of plaintiff's motion to amend the pleadings to conform to the evidence. Accordingly, we overrule Mount Carmel's second assignment of error.

{¶ 63} We next turn to the Zochowski defendants' first assignment of error and Mount Carmel's first assignment of error. These two assignments of error are substantially similar, so we will address them together. By the two assignments of error, defendants argue that the trial court erred in allowing plaintiff to read Fleming's deposition at trial. We find that the trial court erred as alleged, but we conclude that that error was harmless.

{¶ 64} Right before trial started, the Zochowski defendants' counsel informed the trial court that he had just learned that plaintiff's counsel intended to read Fleming's deposition during plaintiff's case-in-chief. The Zochowski defendants objected to the reading of Fleming's deposition on the basis that the deposition was inadmissible against them under Civ.R. 32. Pursuant to Civ.R. 32(A), a party may use a deposition at trial against "any party who was present or represented at the taking of the deposition or who had reasonable notice thereof" if the deponent is an attending physician. Fleming's deposition occurred before plaintiff filed suit against the Zochowski defendants, and consequently, the Zochowski defendants received no notice of the deposition and neither Zochowski nor his attorney attended.[7] Only the Donaldson defendants and Mount Carmel were represented at Fleming's deposition.

{¶ 65} The trial court determined that Civ.R. 32(A) permitted the introduction of Fleming's testimony against the Donaldson defendants and Mount Carmel, but not against the Zochowski defendants. The trial court, therefore, ruled that plaintiff's counsel could read Fleming's deposition, but the court would instruct the jury to only consider that testimony in determining the liability of the Donaldson defendants and Mount Carmel.

{¶ 66} The next day, plaintiff again raised the admissibility of Fleming's deposition testimony. Plaintiff argued that Fleming's deposition testimony was admissible against

---

[7] Plaintiff filed suit against the Zochowski defendants on June 29, 2012, approximately four months after Fleming's deposition occurred. Plaintiff deposed Fleming while conducting discovery in the suit against the Donaldson defendants and Mount Carmel, which was filed on April 27, 2011.

the Zochowski defendants under Evid.R. 804(B)(1). Pursuant to Evid.R. 804(B)(1), the testimony of an unavailable declarant is admissible if that testimony is given:

> at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

{¶ 67} Plaintiff contended he could satisfy the requirements of Evid.R. 804(B)(1) because Fleming was unavailable to testify at trial and the Donaldson defendants, who were represented at Fleming's deposition, had a motive to develop Fleming's testimony that was similar to the Zochowski defendants' motive. After hearing argument from both sides, as well as testimony from the private investigator who tried to subpoena Fleming, the trial court ruled in plaintiff's favor. The trial court determined that plaintiff could read Fleming's deposition without an accompanying limiting instruction. On the third day of the trial, plaintiff read Fleming's deposition to the jury.

{¶ 68} On appeal, defendants argue that the trial court erred in admitting Fleming's deposition testimony into evidence. Whether to admit or exclude evidence is a decision that rests within the broad discretion of the trial court. *Banford v. Aldrich Chem. Co.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 38; *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20. Appellate courts will uphold evidentiary rulings absent an abuse of discretion. *Banford* at ¶ 38; *Beard* at ¶ 20. Moreover, even in the event of an abuse of discretion, an appellate court will affirm the trial court's evidentiary ruling unless the abuse materially prejudiced a party. *Banford* at ¶ 38; *Beard* at ¶ 20.

{¶ 69} Generally, deposition testimony is inadmissible at trial because it is hearsay. *See Bedard v. Gardner*, 2d Dist. No. 20430, 2005-Ohio-4196, ¶ 85 (physician's deposition constituted hearsay). A trial court, however, may admit deposition testimony into evidence if that testimony fits within a hearsay exception found in the United States or Ohio Constitutions, a statute enacted by the General Assembly that is not in conflict with a rule of the Supreme Court of Ohio, the Ohio Rules of Evidence, or "other rules prescribed by the Supreme Court of Ohio." Evid.R. 802. Civ.R. 32(A), which allows the use of depositions at trial for certain purposes, is a rule prescribed by the Supreme Court

of Ohio. *See Rockey v. 84 Lumber Co.*, 66 Ohio St.3d 221, 224-25 (1993) (the Supreme Court of Ohio promulgated the Ohio Rules of Civil Procedure pursuant to Article IV, Section 5(B) of the Ohio Constitution). Thus, Civ.R. 32(A) is an exception to the general prohibition against hearsay evidence. *Bedard* at ¶ 85. Here, however, Civ.R. 32(A) did not permit the admission of Fleming's deposition against the Zochowski defendants because plaintiff could not meet the requirements of the rule.

{¶ 70} With Civ.R. 32 inapplicable, plaintiff sought to admit Fleming's deposition under another hearsay exception: Evid.R. 804(B)(1). That rule permits the admission of former testimony when the declarant is unavailable to testify at trial. Former testimony becomes admissible under Evid.R. 804(B)(1) if two "separate, conjunctive requirements" are met: (1) the party against whom the testimony is offered or, in a civil action or proceeding, a predecessor-in-interest, had an opportunity to examine the declarant when he gave his testimony, and (2) that party, or its predecessor-in-interest, had a motive that is similar to the party's present motive to develop the former testimony by direct, cross, or redirect examination. *Burkhart v. H.J. Heinz Co.*, 140 Ohio St.3d 429, 2014-Ohio-3766, ¶ 3, 31.

{¶ 71} Because the instant case is a civil proceeding, the first Evid.R. 804(B)(1) requirement is satisfied if a predecessor-in-interest to the Zochowski defendants had an opportunity to examine Fleming at his deposition. As used in Evid.R. 804(B)(1), the term "predecessor-in-interest" " 'was intended to mean "privity" or some analogous concept implicating a true succession of legal interests.' " *Burkhart* at ¶ 26, quoting Weissenberger, *Ohio Evidence*, Section 804.16, at 234, fn. 730. A person "is in privity with another if he succeeds to an estate or an interest formerly held by the other * * * because privity is a succession of interest or relationship to the same thing." *Columbus v. Union Cemetery Assn.*, 45 Ohio St.2d 47, 51 (1976). Thus, for Civ.R. 804(B)(1) purposes, a "predecessor-in-interest" is one " 'from whom the present party received the right, title, interest or obligation that is at issue in the current litigation.' " *Burkhart* at ¶ 26, quoting Lilly, *An Introduction to the Law of Evidence*, Section 7.23, at 328.

{¶ 72} In *Burkhart*, the Supreme Court of Ohio cautioned against conflating the first and second requirements of Evid.R. 804(B)(1). *Burkhart* at ¶ 31. Hearsay testimony is not admissible under Evid.R. 804(B)(1) merely because a person attending a deposition

had an opportunity and similar motive to develop the deposition testimony; that person must also share privity with the party against whom the testimony is subsequently offered. *Burkhart* at ¶ 27.

{¶ 73} To fit within the first requirement of Evid.R. 804(B)(1), plaintiff first argues that privity exists between Zochowski and Mount Carmel, whose attorney attended Fleming's deposition, because Zochowski is Mount Carmel's agent. We are not persuaded. For Mount Carmel to qualify as Zochowski's predecessor-in-interest, Zochowski must have received from Mount Carmel a right, title, interest, or obligation that is at issue in the current litigation. Plaintiff identifies no such right, title, interest, or obligation. Thus, Mount Carmel is not a predecessor-in-interest to Zochowski.

{¶ 74} Plaintiff next argues that privity exists between Zochowski and Donaldson, whose attorney attended Fleming's deposition, because Donaldson joined the medical team caring for Whitmer before Zochowski. At best, this makes Donaldson Zochowski's predecessor, but does not establish that Donaldson is Zochowski's predecessor-in-interest. Donaldson is a plastic surgeon, and Zochowski a trauma surgeon. With regard to Whitmer, each physician had different roles and responsibilities, which they concurrently pursued while working together. Donaldson did not pass any obligation to Zochowski; rather, each physician owed Whitmer a separate, ongoing obligation to provide him with medical treatment that met the standard of care as long as they treated him. While both physicians shared an interest in proving that their care was not negligent, that shared interest is not the type of interest that creates the sort of privity necessary for meeting the first Evid.R. 804(B)(1) requirement. *See Burkhart* at ¶ 36 ("A predecessor-in-interest relationship is not established merely by showing that the parties to the proceedings shared an interest in the material facts and outcome of the case."). In conclusion, no predecessor-in-interest relationship exists between Donaldson and Zochowski because Donaldson did not impart any right, title, interest, or obligation to Zochowski that is at issue in this litigation.

{¶ 75} As neither Mount Carmel nor Donaldson qualify as a predecessor-in-interest to Zochowski, plaintiff cannot meet the first Evid.R. 804(B)(1) requirement.

Therefore, we conclude that the trial court erred in relying on Evid.R. 804(B)(1) to admit Fleming's deposition testimony into evidence against the Zochowski defendants.[8]

{¶ 76} The finding of error does not conclude our analysis. As we stated above, an error in the admission of evidence only warrants a reversal if the error prejudices the appealing party. *Banford*, 126 Ohio St.3d 210, 2010-Ohio-2470, at ¶ 38; *Beard*, 106 Ohio St.3d 237, 2005-Ohio-4787, at ¶ 20. If a jury probably would have arrived at the same decision absent the occurrence of the error, then the error is harmless and will not justify reversal. *Hayward v. Summa Health Sys./Akron City Hosp.*, 139 Ohio St.3d 238, 2014-Ohio-1913, ¶ 25; *accord Theobald v. Univ. of Cincinnati*, 160 Ohio App.3d 342, 2005-Ohio-1510, ¶ 17 ("When avoidance of the error would not have changed the outcome of the proceedings, then the error neither materially prejudices the complaining party nor affects a substantial right of the complaining party."). Moreover, error in the admission of evidence is harmless when the evidence is cumulative to other, properly admitted evidence. *State v. Williams*, 38 Ohio St.3d 346, 350 (1988); *Havanec v. Havanec*, 10th Dist. No. 08AP-465, 2008-Ohio-6966, ¶ 18; *accord Zappola v. Leibinger*, 8th Dist. No. 86038, 2006-Ohio-2207, ¶ 110-11 (erroneous admission of hearsay testimony in a medical malpractice trial did not prejudice the appealing party because that testimony merely echoed properly admitted testimony).

{¶ 77} We thus must determine the extent to which Fleming's deposition testimony influenced the outcome of this case. To do that, we must examine what Fleming said in his deposition and evaluate the impact of that testimony on the jury's verdict in light of all the other evidence in the case. If the jury probably would have reached the same verdict had the trial court instructed the jury not to consider Fleming's testimony against the Zochowski defendants, then the erroneous admission of the testimony is harmless and does not warrant reversal.

{¶ 78} Fleming spent most of his deposition explaining the course of his treatment of Whitmer. That testimony duplicated the evidence already existing in Whitmer's

---

[8] Given this conclusion, we will not address defendants' arguments that (1) Fleming was not "unavailable as a witness," which is a prerequisite for the admission of testimony under Evid.R. 804(B)(1), or (2) plaintiff could not satisfy the second Evid.R. 804(B)(1) requirement. The above conclusion moots both arguments.

medical records, which were admitted at trial.   Consequently, Fleming's deposition testimony explaining his treatment of Whitmer did not prejudice defendants.

{¶ 79} Beyond that, Fleming's testimony touched on three areas that potentially prejudiced defendants.   First, Fleming stated that he did not know about the severe headaches Whitmer suffered on May 20 and 21, and he was not asked to clear Whitmer for the rescheduled surgery.   This testimony, however, paralleled Zochowski's testimony. Zochowski admitted at trial that he did not consult with Fleming on May 20 or 21.   As the trauma surgeon assigned to Whitmer, Zochowski had the responsibility to seek a neurosurgical consult if anything changed in Whitmer's neurological condition.   As Zochowski did not consult with Fleming on May 20 and 21, Fleming could not have learned of Whitmer's headaches, nor could he have provided clearance for the rescheduled surgery.   Thus, Fleming's testimony regarding his noninvolvement with Whitmer on May 20 and 21 did not prejudice defendants.

{¶ 80} Second, during Fleming's deposition, plaintiff's counsel asked, "[W]as it required[,] do you believe[,] under the standard of care for [Whitmer] to receive * * * neurosurgical clearance before going for [the May 19 or 22] surgeries?"  (Fleming Dep. at 89.)   Fleming answered, "I think given the extent of his injuries, input from us with respect to clearance would have been advisable."  *Id.*  This answer constituted a weak echo of Gelman's and Bloomfield's testimony.   Both of plaintiff's expert witnesses opined that, given the circumstances in this case, the standard of care required that neurosurgery clear Whitmer for the May 22 plastic surgery.   Therefore, Fleming's testimony that neurosurgical input was merely advisable did not prejudice defendants.

{¶ 81} Third, and most problematically, Fleming testified about what he would have done had he known of either Whitmer's headaches or the rescheduled surgery.  With regard to the headaches, Fleming stated that, had he known of the headaches, he would have wanted to examine Whitmer to determine the nature and cause of the headaches.  If the pain came from inside Whitmer's head, as opposed to pain originating from his facial bruising and fractures, Fleming probably would have ordered a CT scan.  With regard to the rescheduled surgery, Fleming stated that, "[i]f [he] had known [Whitmer] was going to surgery on the 22nd and then [was] asked [his] input on it, [he] would have said that [Whitmer] would need a CAT scan first."  (Fleming Dep. at 112.)

{¶ 82} Fleming's testimony about what he would have done correlates with the testimony of plaintiff's neurosurgical expert, Bloomfield. As we stated above, Bloomfield testified that, under the standard of care, a neurosurgeon informed that a patient like Whitmer was suffering from ten-out-of-ten headaches would order a CT scan. Bloomfield also stated that, under the standard of care, a neurosurgeon asked to clear a patient like Whitmer for surgery would order a CT scan, even in the absence of headaches.

{¶ 83} At the core of each of plaintiff's theories of negligence is the failure to call in neurosurgery on May 20 or 21. To establish that this failure proximately caused Whitmer's death, plaintiff had to show that a neurosurgeon asked to evaluate Whitmer's condition would have ordered a CT scan. According to Bloomfield, a CT scan performed on May 20 or 21 would have shown a significant midline shift. That midline shift, along with the results of a neurological examination, would have resulted in the cancellation of the plastic surgery and the performance of an emergency burr hole surgery. Because no CT scan was performed, the plastic surgery went forward and resulted in the chain of events that ended with Whitmer's death. Consequently, under plaintiff's theory of the case, Whitmer's survival essentially hinged on the CT scan: with it, Whitmer would have lived; without it, Whitmer died.

{¶ 84} In advocating this theory in closing argument, plaintiff's counsel stated, "All roads in this case lead to a CT. * * * [A]ll roads lead to Dr. Fleming." (Tr. Vol. X(B) at 16, 19.) While defendants stress the latter statement in arguing the prejudicial effect of Fleming's testimony, they ignore that Bloomfield testified that the standard of care required a CT scan. Thus, under either Fleming's or Bloomfield's testimony, all roads led to Fleming because Fleming was the neurosurgeon who would have ordered the CT scan, examined Whitmer, diagnosed the expanding subdural hematoma, and performed the life-saving burr hole surgery.

{¶ 85} Because plaintiff had Bloomfield's testimony, he did not need Fleming's testimony to prove his theory of the case. The jury accepted plaintiff's theory. Consequently, in the absence of Fleming's testimony, the jury probably would have reached the same result on the strength of Bloomfield's testimony alone. Fleming's testimony, therefore, did not prejudice defendants.

{¶ 86} Finally, defendants argue that a question that the jury asked during its deliberations shows that the jury gave Fleming's deposition testimony undue attention and consideration. Soon after the jury began its deliberations, it inquired into why Fleming did not appear in court to testify. The trial court answered that "[t]his is not an issue to be considered by the jury. Dr. Fleming's trial deposition was read to the jury and is evidence which the jury may consider." (Tr. Vol. XI at 8.)

{¶ 87} We see nothing in the jury's question that implies that the jury gave Fleming's testimony special weight. Fleming was the only witness who did not appear at trial and give testimony directly to the jury. Given these circumstances, the jury's curiosity is understandable. We cannot infer any prejudice to defendants based on a question that merely sought an explanation for Fleming's absence.

{¶ 88} In sum, we conclude that the trial court erred in allowing plaintiff to read Fleming's deposition to the jury without a limiting instruction. However, we also find that the jury probably would have found in plaintiff's favor even if the trial court had introduced Fleming's testimony with a limiting instruction. Accordingly, we conclude that the trial court's error did not prejudice defendants, and we overrule the Zochowski defendants' first assignment of error and Mount Carmel's first assignment of error.

{¶ 89} We next turn to the Zochowski defendants' second assignment of error and Mount Carmel's third assignment of error. By these assignments of error, defendants argue that the trial court erred in giving the jury "multiple choice" interrogatories to answer. We disagree.

{¶ 90} In this case, plaintiff alleged that Zochowski committed multiple negligent acts. All parties proposed jury interrogatories that required the jury to specify which of the alleged acts were actually negligent. The Zochowski defendants proposed interrogatories that sought a narrative answer explaining how Zochowski was negligent. In their proposed interrogatories, the Zochowski defendants asked:

> Do you find by a preponderance of evidence that Dr. Adam Zochowski negligently provided care and treatment to Carl A. Whitmer?
>
> **CIRCLE YOUR ANSWER IN INK          YES OR NO**
>
> * * *

> If your answer to [the previous interrogatory] is "YES," state how and in what respect(s) Dr. Adam Zochowski was negligent.

(June 30, 2014 Proposed Jury Instructions, Jury Interrogs. and Verdict Forms of Defs. Adam M. Zochowski, M.D. and Cent. Ohio Surgical Assocs., Inc. at 38-40.)

{¶ 91} Plaintiff proposed more specific interrogatories. As given to the jury, these interrogatories asked:

> Was Dr. Adam M. Zochowski negligent in regards to surgical clearances for Carl Whitmer to undergo surgery by Dr. Donaldson on May 22, 2010?
>
> *All jurors so agreeing circle your answer in ink YES or NO and sign below:*
>
> * * *
>
> Was Dr. Zochowski negligent when he cleared Carl Whitmer to undergo surgery by Dr. Donaldson on May 22, 2010?
>
> *All jurors so agreeing circle your answer in ink YES or NO and sign below:*
>
> * * *
>
> Was Dr. Zochowski negligent in his communication with Dr. Donaldson between May 19 and May 22, 2010, with respect to Carl Whitmer?
>
> *All jurors so agreeing circle your answer in ink YES or NO and sign below:*
>
> * * *
>
> Was Dr. Zochowski negligent in his evaluation of Carl Whitmer on May 20, 2010?
>
> *All jurors so agreeing circle your answer in ink YES or NO and sign below:*
>
> * * *
>
> Was Dr. Zochowski negligent in his evaluation of Carl Whitmer on May 21, 2010?

> *All jurors so agreeing circle your answer in ink  YES  or  NO*
> *and sign below:*

(Aug. 13, 2014 Jury Interrogs. as to Adam M. Zochowski, M.D. and Cent. Ohio Surgical Assocs., Inc. at No. 11A to 15A.)[9]

{¶ 92} The trial court decided to give the jury both sets of interrogatories.  In response to the Zochowski defendants' interrogatories, the jury found Zochowski negligent because he "[f]ailed to communicate [to] nurses, specialists, and consultants," and he "[f]ailed to gather information existing on change in patient condition."  ( Jury Interrogs. as to Adam M. Zochowski, M.D. and Cent. Ohio Surgical Assocs., Inc. at No. 10; Tr. Vol. XII at 12.)  The jury answered each of plaintiff's interrogatories affirmatively. (Aug. 13, 2014 Jury Interrogs. as to Adam M. Zochowski, M.D. and Cent. Ohio Surgical Assocs., Inc. at No. 11A, 12A, 13A, 14A, & 15A; Tr. Vol. XII at 12-14.)

{¶ 93} On appeal, defendants challenge the content and form of plaintiff's interrogatories.  Civ.R. 49(B) addresses jury interrogatories.  Pursuant to that rule:

> [t]he court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. * * * [T]he interrogatories shall be submitted to the jury in the form that the court approves.  The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.

{¶ 94} Jury interrogatories serve the purpose of "test[ing] the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial." *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.*, 28 Ohio St.3d 333, 336-37 (1986).  Thus, proper interrogatories result in answers that enable a court to determine as a matter of law whether a verdict shall stand.  *Freeman v. Norfolk & W. Ry. Co.*, 69 Ohio St.3d 611, 613-14 (1994).

{¶ 95} When a plaintiff alleges more than one act of negligence, " 'it is proper to instruct the jury to specify of what the negligence consisted.' "  *Moretz v. Muakkassa*, 137

---

[9] Each of plaintiff's proposed interrogatories included multiple parts.  If the jury found that a negligent act occurred under the first part, the second part of each interrogatory asked the jury to determine if the negligent act proximately caused injury.  Because the parts addressing proximate cause are not at issue here, we do not quote them.

Ohio St.3d 171, 2013-Ohio-4656, ¶ 79, quoting *Freeman* at 614. Consequently, a trial court errs if, in a case that includes multiple distinct allegations of negligence, it rejects a proposed interrogatory that asks the jury to identify which of the defendant's acts were negligent. *Id.* at ¶ 85.

{¶ 96} Although Civ.R. 49(B) mandates that a trial court submit to the jury the interrogatories the parties request, the trial court is not a mere conduit through which the requested interrogatories flow. *Ramage v. Cent. Ohio Emergency Servs., Inc.*, 64 Ohio St.3d 97, 107 (1992). A trial court has authority to control the substance and form of the interrogatories submitted to the jury. *Id.*; *Freeman* at 613; *accord Cincinnati Riverfront Coliseum, Inc.* at 336 (holding that Civ.R. 49 "reposes discretion in the court to pass upon the *content* of requested interrogatories") (emphasis sic). Thus, the trial court may reject proposed interrogatories that are ambiguous, confusing, redundant, or otherwise legally objectionable. *Ramage* at 107-08. Appellate courts review a trial court's decision to submit a proposed interrogatory to a jury under the abuse-of-discretion standard. *Freeman* at 614.

{¶ 97} In the case at bar, defendants initially argue that the trial court erred in rejecting the Zochowski defendants' proposed interrogatories and only giving the jury plaintiff's "yes or no" interrogatories. Defendants mistake what occurred below. The trial court did not reject the Zochowski defendants' proposed interrogatories. Rather, the trial court submitted both the Zochowski defendants' and plaintiff's proposed interrogatories to the jury. Therefore, the trial court did not commit the error alleged.

{¶ 98} Next, defendants argue that a jury interrogatory that seeks an answer as to how a defendant was negligent must be in narrative form. Defendants thus contend that the trial court erred in submitting plaintiff's interrogatories, which sought a "yes or no" answer, to the jury. We recently addressed this issue in *Clark v. Grant Med. Ctr.*, 10th Dist. No. 14AP-833, 2015-Ohio-4958, *appeal not accepted*, 2016-Ohio-2807. There, the jury answered interrogatories identical in form to the "yes or no" interrogatories that plaintiff proposed in this case. Like defendants in the case at bar, the defendants in *Clark* argued that *Moretz* precluded the submittal of such interrogatories to the jury. In rejecting this argument, we acknowledged that, in *Moretz* and other cases, the Supreme Court has expressly approved a narrative-form interrogatory to determine which of a

defendant's acts is negligent. *Clark* at ¶ 45. However, neither the Supreme Court nor any other Ohio court has disapproved of the "yes or no" form of interrogatory.[10] *Id.* We thus concluded that the "yes or no" form of an interrogatory did not automatically render that interrogatory improper. *Id.* Based on our holding in *Clark*, we conclude that "yes or no" form of plaintiff's requested interrogatories did not preclude the trial court from submitting them to the jury.

{¶ 99} Mount Carmel also argues that the trial court should not have given plaintiff's "yes or no" interrogatories to the jury because the answers to them would not decide any determinative issue. Mount Carmel maintains that plaintiff's interrogatories were not determinative because the answer to the Zochowski defendants' interrogatories would subsume all possible answers to plaintiff's interrogatories. This argument raises the question of whether plaintiff's interrogatories were duplicative of the Zochowski defendant's interrogatories, not whether plaintiff's interrogatories were non-determinative. The trial court could have rejected either plaintiff's or the Zochowski defendants' proposed interrogatories on the basis that giving both resulted in redundancy. We, however, find no abuse of discretion in the trial court's decision to give both. The interrogatories, while overlapping, were sufficiently clear so as not to create confusion.

{¶ 100} Finally, we must address defendants' arguments that plaintiff's "yes or no" interrogatories shifted the burden of proof to defendants and induced the jury to find in plaintiff's favor. In support of defendants' arguments, Mount Carmel points to a "yes or no" interrogatory that asked if Zochowski was negligent in failing to obtain a "proper" clearance for the May 22 plastic surgery. Mount Carmel argues that this interrogatory implicitly adopted plaintiff's position on the disputed issue of whether a separate neurosurgical clearance was needed for the May 22 plastic surgery. Plaintiff maintained that such a clearance was necessary; defendants argued that the clearance for the May 19 surgery carried over, making a separate clearance unnecessary.

{¶ 101} Even if we assume an implicit bias existed within the interrogatory in question, Mount Carmel's argument fails because that interrogatory was never given to

---

[10] Contrary to defendants' contention, the Eleventh District Court of Appeals did not weigh in on this issue in *Cobb v. Shipman*, 11th Dist. No. 2013-T-0117, 2015-Ohio-2604. There, the Eleventh District held that the trial court did not err in refusing to give the narrative-form interrogatory requested by the defense because the plaintiff only alleged one act of negligence. *Id.* at ¶ 44. The court did not conclude, as defendants assert, that the submittal of non-narrative interrogatories constitutes reversible error.

the jury. When defendants objected to the interrogatory, plaintiff changed it so that it merely asked the jury whether Zochowski was "negligent in regards to surgical clearance" for the May 22 plastic surgery. (Jury Interrogs. as to Adam M. Zochowski, M.D. and Cent. Ohio Surgical Assocs., Inc. at No. 11A; Tr. Vol. XII at 12.) We fail to see how the interrogatory actually given forced defendants and the jury to disprove plaintiff's case, as Mount Carmel asserts.

{¶ 102} Reviewing the totality of the "yes or no" interrogatories, we conclude that they contain none of the unfairness defendants complain about. None of the "yes or no" interrogatories explicitly or implicitly endorsed plaintiff's arguments. None of the "yes or no" interrogatories suggested that a "yes" answer was preferable to a "no" answer. We thus conclude that the trial court did not err in submitting both the Zochowski defendants' and plaintiff's proposed interrogatories to the jury. Accordingly, we overrule the Zochowski defendants' second assignment of error and Mount Carmel's third assignment of error.

{¶ 103} We next turn to the Zochowski defendants' third and fourth assignments of error and Mount Carmel's fourth assignment of error. By these assignments of error, defendants argue that the trial court erred in allowing Gelman to testify as an expert witness in trauma surgery. Defendants also argue that, without Gelman's testimony, plaintiff cannot show that Zochowski breached the standard of care, and consequently, the Zochowski defendants should have received a directed verdict. We disagree with all of defendants' arguments.

{¶ 104} Evid.R. 702 sets forth the circumstances under which expert testimony is admissible. Pursuant to that rule, "[a] witness may testify as an expert if all of the following apply:"

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

{¶ 105} To qualify as an expert under Evid.R. 702(B), a witness need not be the best witness on the subject or demonstrate complete knowledge of the field in question. *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159 (1978); *Ellinger v. Ho*, 10th Dist. No. 08AP-1079, 2010-Ohio-553, ¶ 30. Moreover, in the case of medical experts, the witness need not practice in the same specialty as the defendant physician. *Alexander* at 158; *Smith v. ProMedica Health Sys., Inc.*, 6th Dist. No. L-06-1333, 2007-Ohio-4189, ¶ 16; *Nead v. Brown Cty. Gen. Hosp.*, 12th Dist. CA2005-09-018, 2007-Ohio-2443, ¶ 45. A witness qualifies as a medical expert if the witness "demonstrate[s] a knowledge of the standards of the school and specialty, if any, of the defendant physician which is sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards and not to the standards of the witness' school and, or, specialty if it differs from that of the defendant." *Alexander* at 160. In other words, the scope of a witness' knowledge, not the artificial classification by title, governs whether a witness is competent to testify as an expert in the defendant physician's specialty. *Id.* A trial court has broad discretion to determine the admissibility of expert testimony, and an appellate court will not reverse that determination absent an abuse of discretion. *Id.* at 157.

{¶ 106} Here, defendants contend that Gelman was not qualified to give expert testimony as to the standard of care applicable to Zochowski because Gelman practices as a plastic surgeon, not a trauma surgeon. In response, plaintiff points out that Gelman completed a five-year residency in general surgery at a major trauma hospital. During the fourth and fifth years of his residency, Gelman served as the chief resident in trauma surgery. Gelman testified that, based on his training, he was able to state the standard of care for a trauma surgeon. In response to this evidence, defendants assert that Gelman's training should not qualify him as an expert in trauma surgery because it occurred over 22 years before trial.

{¶ 107} The trial court found Gelman's training sufficient to qualify Gelman as an expert witness in trauma surgery. Although defendants challenged Gelman's credentials with regard to trauma surgery, he has some credentials in this area of practice. The evidence shows that Gelman has some training and knowledge regarding the standard of

care for trauma surgeons. Consequently, we cannot find that the trial court abused its discretion in allowing Gelman to testify as an expert witness in trauma surgery.

{¶ 108} Because Gelman testified that Zochowski breached the standard of care in multiple respects, the record contained sufficient evidence for the jury to decide in plaintiff's favor. The trial court, therefore, did not err in denying the Zochowski defendants' motion for directed verdict. *See Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, ¶ 31, quoting *Strother v. Hutchinson*, 67 Ohio St.2d 282, 284-85 (1981) (" '[I]f there is substantial competent evidence to support the party against whom the motion [for directed verdict] is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied.' "). Accordingly, we overrule the Zochowski defendants' third and fourth assignments of error and Mount Carmel's fourth assignment of error.

{¶ 109} We next turn to the Zochowski defendants' fifth assignment of error, by which they argue that the trial court erred in excluding evidence that alcohol intoxication caused Whitmer to drive his car off the road and into a utility pole. The Zochowski defendants point out that they raised the affirmative defense of contributory negligence in their answer. The Zochowski defendants contend that the trial court should have allowed them to prove their defense by presenting evidence that Whitmer's negligence in drinking and driving proximately caused his death. We disagree.

{¶ 110} To prove the affirmative defense of contributory negligence, a defendant must present evidence that the plaintiff's own want of care combined and concurred with the defendant's lack of care and contributed to the injury as a proximate cause and as an element without which the injury would not have occurred. *Brinkmoeller v. Wilson*, 41 Ohio St.2d 223, 226 (1975); *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 70 (10th Dist.). Thus, for contributory negligence to arise in medical malpractice cases, the patient's negligence must be contemporaneous with the malpractice of the physician. *Reeves* at ¶ 71; *Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 9th Dist. No. 24219, 2009-Ohio-2460, ¶ 61; *Lambert v. Shearer*, 84 Ohio App.3d 266, 284 (10th Dist.1992). Any negligence that occurs prior to the patient entering the care of the physician does not constitute negligence contributing to the injury sustained as a result of the physician's negligence. *Reeves* at ¶ 71; *Segedy* at ¶ 61; *Lambert* at 284. A physician,

therefore, cannot base a contributory negligence defense on the negligent conduct that triggers the patient's need for medical treatment.

{¶ 111} The majority of cases addressing this issue, as well as Third Restatement of Torts, concur with the law set out above. *See Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 130 (Tenn.2004) (holding that a patient's negligence in crashing his car after drinking could not be compared with the defendant hospital's subsequent negligence in treating the injuries sustained in the car accident); *Rowe v. Sisters of the Pallottine Missionary Soc.*, 211 W.Va. 16, 22 (2001) (in a medical malpractice case, the trial court properly refrained from instructing the jury on comparative negligence based on the plaintiff's negligent conduct in causing his motorcycle crash, in which he sustained the injuries that the defendant was negligent in treating); *Fritts v. McKinne*, 1996 OK CIV APP 132, 934 P.2d 371, ¶ 19 (holding that the trial court erred in allowing a jury to consider comparative negligence—based on the decedent's drinking before his one-vehicle crash—as a basis for reducing or denying recovery for subsequent medical malpractice); *Yuscavage v. Jones*, 213 Ga.App. 800, 801 (1994) (in a medical malpractice case, holding that the trial court properly excluded evidence of the plaintiff's blood alcohol level after the car crash that caused him to seek the allegedly negligent medical treatment); Restatement of the Law 3d, Torts, Section 7, Comment m (2000) ("[I]n a case involving negligent rendition of a service, including medical services, a factfinder does not consider any plaintiff's conduct that created the condition the service was employed to remedy.").

{¶ 112} Courts reason that patients who have negligently injured themselves are nevertheless entitled to subsequent non-negligent medical treatment and to an undiminished recovery if such subsequent non-negligent medical treatment is not received. *Mercer* at 130; *Rowe* at 22; *accord Harvey v. Mid-Coast Hosp.*, 36 F.Supp.2d 32, 38 (D.Me.1999) ("It would be anomalous to posit, on the one hand, that a health care provider is required to meet a uniform standard of care in its delivery of medical services to all patients, but permit, on the other hand, the conclusion that, where a breach of that duty is established, no liability may exist if the patient's own preinjury conduct caused the illness or injury which necessitated the medical care."). As this court stated, " '[s]ick people deserve the same care whether they smoke, drink, drive too fast, or engage in

socially unacceptable behavior' " prior to coming under a physician's care.  *Reeves* at ¶ 71, quoting *Lambert* at 284.

{¶ 113}  Here, any negligence resulting from Whitmer's drunk driving occurred prior to Zochowski's negligent treatment of him.  Therefore, evidence that Whitmer was drinking before a one-vehicle crash could not serve as a basis for finding Whitmer contributorily negligent for his death.  Accordingly, we conclude that the trial court did not err in excluding evidence of Whitmer's drinking and driving, and we overrule the Zochowski defendants' fifth assignment of error.

{¶ 114}  By the Zochowski defendants' sixth assignment of error, they argue that the trial court erred in granting plaintiff prejudgment interest under R.C. 1343.03(C).  We disagree.

{¶ 115}  Under R.C. 1343.03(C)(1), a trial court shall grant a party prejudgment interest if:

> upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to the settle the case.

R.C. 1343.03(C) serves to encourage litigants to make a good-faith effort to settle their case, thus conserving legal resources and promoting judicial economy.  *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 657-58 (1994); *Kalain v. Smith*, 25 Ohio St.3d 157, 159 (1986).

{¶ 116}  Pursuant to the standard articulated in *Kalain* and reaffirmed in *Moskovitz*:

> [a] party has not "failed to make a good faith effort to settle" under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party.

*Moskovitz* at 658; *Kalain* at syllabus. The failure to satisfy the last requirement will not result in a finding of lack of good faith if the party " 'has a good faith, objectively reasonable belief that he has no liability.' " *Moskovitz* at 658-59; *Kalain* at syllabus. Courts, however, must strictly construe that exception. *Moskovitz* at 659. Moreover, the existence of a good faith, objectively reasonable belief of no liability does not excuse a defendant from satisfying the remaining three requirements. *Galayda v. Lake Hosp. Sys., Inc.*, 71 Ohio St.3d 421, 429 (1994). A trial court has discretion to determine whether the parties have exercised good faith, and an appellate court will only reverse such a determination if the trial court has abused its discretion. *Moskovitz* at 658.

{¶ 117} Here, the Zochowski defendants do not dispute the trial court's conclusion that plaintiff made a good-faith effort to settle the case. The Zochowski defendants instead challenge the trial court's conclusion that they failed to make a good-faith effort to settle the case. Two of the *Kalain* requirements are at issue here; namely, whether the Zochowski defendants rationally evaluated their risks and potential liability and whether the Zochowski defendants made a good-faith monetary settlement offer or responded in good faith to an offer from plaintiff. During the two-year pendency of this case before the trial court, the Zochowski defendants (1) did not make any settlement offers, (2) did not respond to plaintiff's settlement demands with counteroffers, and (3) did not engage in settlement negotiations with plaintiff. Thus, the Zochowski defendants failed to make a good-faith effort to settle the case unless they had a good faith, objectively reasonable belief that they had no liability.

{¶ 118} Determining whether a defendant has a good faith, objectively reasonable belief that he has no liability necessitates reviewing whether the defendant rationally evaluated his risks and potential liability. A defendant who does not rationally evaluate his risks and potential liability cannot hold a good faith, objectively reasonable belief of no liability. Thus, our consideration of the two requirements merges into one analysis.

{¶ 119} In assessing the risk of potential liability, a party must evaluate both the likelihood of the event occurring, i.e., its probability, and its impact if it should happen, i.e., its magnitude. *Jeffrey v. Marietta Mem. Hosp.*, 10th Dist. No. 11AP-492, 2013-Ohio-1055, ¶ 88. Here, from the filing of the complaint, the Zochowski defendants' insurer and attorney predicted that the Zochowski defendants faced a 25 to 30 percent chance that a

jury would find them liable. The insurer evaluated its risk of exposure to liability as "[m]edium" with "factors exist[ing] that may be at issue." (Pl.'s Ex. 1, Dec. 22, 2014 Hearing on Prejudgment Interest, Claim Evaluation Reports.) Moreover, the insurer estimated that a potential damages award would exceed one million dollars, with the Zochowski defendants responsible for 20 to 25 percent of that award.

{¶ 120} The Zochowski defendants' insurer understood the vulnerability in the defense case. Soon after plaintiff filed claims against the Zochowski defendants, the insurer obtained a review of Zochowski's treatment of Whitmer from an in-house consultant. In that review, the consultant stated:

> I opine that [Zochowski's] trauma care was appropriate and within the standard of care. The only questions I would raise was whether there was communication between Drs. Zochowski, Donaldson and Dr. Fleming giving the neurological clearance to proceed with the facial fractures surgery, and whether it would be protocol routine to have obtained another CT scan of the brain preoperatively despite the patient improving neurologically. I suspect that the answer would be that it would be the standard of care to have obtained another CT scan to document the status of the brain findings.

(Pl.'s Ex. 1, Dec. 22, 2014 Hearing on Prejudgment Interest, Aug. 12, 2012 letter from in-house consultant to claims specialist.)

{¶ 121} The depositions of Bloomfield and Gelman confirmed that plaintiff had identified the same weakness that the in-house consultant had raised, and that plaintiff intended to build a case on that weakness. Gelman testified that Zochowski breached the standard of care in failing to seek a neurological consult prior to surgery. Bloomfield testified that a neurosurgeon would have ordered a CT scan and diagnosed Whitmer's expanding subdural hematoma, thus saving his life.

{¶ 122} The Supreme Court of Ohio has held that:

> [a] trial court does not abuse its discretion in awarding prejudgment interest when, as here, a defendant "just says no" despite a plaintiff's presentation of credible medical evidence that the defendant physician fell short of the standard of professional care required of him, when it is clear that the plaintiff has suffered injuries, and when the causation of those injuries is arguably attributable to the defendant's conduct.

*Galayda*, 71 Ohio St.3d at 429. Here, evidence emerged during the discovery period that showed that plaintiff had credible medical evidence that Zochowski breached the standard of care and that breach arguably caused Whitmer's death. Thus, the Zochowski defendants' decision to simply reject plaintiff's settlement efforts and not engage in any negotiations showed a lack of good faith. The trial court, therefore, did not abuse its discretion in awarding plaintiff prejudgment interest under R.C. 1343.03(C). Accordingly, we overrule the Zochowski defendants' sixth assignment of error.

{¶ 123} For the foregoing reasons, we overrule the Zochowski defendants' six assignments of error and Mount Carmel's four assignments of error. We affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER and BRUNNER, JJ., concur.

————————